2002 UT 36

Patty BISHOP, individually and as personal representative of the Estate of Douglas J. Bishop, deceased, Bart J. Bishop, Douglas Wade Bishop, Bradley David Bishop, and Joshua Lee Bishop, Plaintiffs and Appellants,

v.

GENTEC INC., a Kentucky corporation, and John Does I—V, Defendants, Third–Party Plaintiff, Appellee, and Cross–Appellant.

v.

Valley Asphalt, Inc., a Utah corporation, Third–Party Defendant and Appellant.

Nos. 20000467, 20000492.

Supreme Court of Utah.

March 29, 2002.

Rehearing Denied June 12, 2002.

⚷74(1)

Allen K. Young, Springville, for plaintiffs

Paul M. Belnap, Andrew D. Wright, Darren K. Nelson, Salt Lake City, for GenTec.

Robert G. Gilchrist, Mark L. McCarty, Brandon B. Hobbs, Lynn S. Davies, Salt Lake City, for Valley Asphalt.

DURHAM, Justice.

## INTRODUCTION

¶ 1 This appeal and cross-appeal challenge the judgment entered in a wrongful death action brought by Patty Bishop individually and as the executor of the decedent Douglas Bishop's estate and Bishop's children. Bishop, an employee of Valley Asphalt, Inc., died as a result of personal injuries sustained while performing repair work on asphalt silo components manufactured by GenTec, Inc., and installed and maintained by Valley Asphalt. Bishop sued GenTec for products liability, and GenTec filed a third-party complaint against Valley Asphalt, seeking indemnification for GenTec's negligence, strict liability, and products liability based on the language in an invoice signed by Valley Asphalt. With respect to the indemnification, the court granted GenTec's motion for summary judgment. The jury allocated fault to both GenTec and Valley Asphalt. Judgment was then apportioned

pursuant to Utah's Liability Reform Act. Bishop moved to amend the jury verdict based on clerical error, but the trial court denied the motion. Valley Asphalt and Bishop appealed, and GenTec filed a cross-appeal.

## BACKGROUND

¶2 In late 1994 or early 1995, Valley Asphalt, planning to expand its asphalt storage capacity, contacted GenTec, a manufacturer and assembler of hot asphalt silos and silo components, to purchase hot asphalt silo components. Valley Asphalt purchased components for an asphalt silo from GenTec on August 7, 1995, and signed GenTec's standard invoice entitled "Equipment Sales Order and Security Agreement." On the reverse side of the pre-printed invoice were two sections entitled "INDEMNIFICA-TION" and "INSTALLATION," which purported to place limitations on GenTec's liability. Soon after completion of the purchase, Valley Asphalt received the silo components and constructed the system pursuant to the specifications provided by GenTec.

¶3 On July 12, 1997, while inspecting and attempting to repair one of Valley Asphalt's asphalt silos, Bishop was caught between the doors of the silo when they suddenly closed and was crushed. He died later that day as a result of his injuries. The components that crushed Bishop were those purchased under the August 7, 1995 invoice. Subsequently, Bishop's executor filed this wrongful death action against GenTec.

¶4 GenTec filed a third-party complaint against Valley Asphalt, seeking apportionment of fault and indemnification under the pre-printed terms on the reverse side of the August 7, 1995 invoice. After review of Gen-Tec's and Valley Asphalt's cross-motions for summary judgment on the indemnification question, the trial court found that the two entities were sophisticated business entities, that they negotiated the terms of the invoice at arm's length, and that the language in the invoice evidenced the intent of the parties to reallocate all liability to Valley Asphalt, including claims against GenTec for negligence, strict liability, and products liability.

¶5 The jury apportioned fault according to a special verdict form, allocating 25 percent of the fault to Bishop, 45 percent to GenTec, and 30 percent to Valley Asphalt. In addition to apportioning fault, the jury determined the amount of general damages to be $750,000 and special damages to be $800,000. Because Valley Asphalt was a party immune from suit pursuant to Utah Code Ann. § 78–27–37(3)(a) (Supp.2001), the trial judge reapportioned Valley Asphalt's 30 percent fault according to Utah's Liability Reform Act ("LRA"), Utah Code Ann. §§ 78–27–37 to –43 (1999), which resulted in allocating 64.29 percent of the total fault to GenTec and 35.71 percent to Bishop. The trial court then reduced the jury's damages award by the 35.71 percentage of fault allocated to Bishop. Both GenTec and Valley Asphalt objected to the reapportionment. They claimed that either Valley Asphalt's liability should be combined with Bishop's liability under the common law doctrine of respondeat superior or, if respondeat superior did not apply, that the reapportionment part of the LRA, section 78–27–39(2)(a), is unconstitutional under both the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Uniform Operation of Laws Clause of the Utah Constitution, art. I, section 24. The trial court overruled GenTec's and Valley Asphalt's constitutional objections. With respect to the respondeat superior argument, the trial court found that the LRA superceded the common law and that "the statute clearly and unambiguously requires that [the] Court must consider the fault of Mr. Bishop and Valley [Asphalt] separately."

¶6 After the trial ended and the jury was excused, Bishop's counsel talked to at least three of the jurors, including the jury foreman, all of whom subsequently signed affidavits indicating they had made a mistake in their calculation of the jury award. In their affidavits, the jurors testified that they had mistakenly subtracted 25 percent (Bishop's proportion of fault as determined by the jury) from the general and special damages, not realizing that the subtraction for Bishop's fault was the duty of the trial court, not the jury. Relying on these affidavits, Bishop moved to amend the jury verdict pursuant to

Utah R. Civ. P. 59, or 60(a) or 60(b); later, however, in a hearing on the matter, Bishop modified his motion from a request for impeachment or amendment of the verdict under rule 59 or rule 60 to one solely for a correction of clerical error under rule 60. Bishop conceded that the juror affidavits would not support a rule 59 motion to impeach the jury verdict.

¶ 7 Bishop argued, with the support of the juror affidavits, that the jury's allocation error reduced the final general and special damages award announced in the jury verdict to a sum that was 25 percent lower than the amount the jury intended to award. Bishop maintained that the jury's intent was further evidenced by the fact that its special damages award was almost exactly 75 percent of the $1,067,000 special damages amount presented by Bishop's expert witness to the jury at trial. The trial court concluded that Bishop's motion to amend the jury verdict was in reality a motion to impeach the verdict and ruled that the affidavits were not admissible pursuant to Utah R. Civ. P. 59(a)(2). In its order, however, the trial court did not specifically address Bishop's rule 60 motion to amend.

## STANDARD OF REVIEW

¶ 8 The application of the LRA in apportioning fault is a legal question of statutory construction, which we review for correctness. *Field v. Boyer Co., L.C.,* 952 P.2d 1078, 1079 (Utah 1998). A district court's disposition of a summary judgment motion is a question of law that we review for correctness. *Schurtz v. BMW of North America, Inc.,* 814 P.2d 1108, 1111–12 (Utah 1991). "We accord a trial court's interpretation of a contract no deference and review it for correctness." *Aquagen Int'l, Inc., v. Calrae Trust,* 972 P.2d 411, 413 (Utah 1998). Mixed questions of law and fact are reviewed for abuse of discretion in applying the law to the facts. *Woodhaven Apartments v. Washing-*

 *ton,* 942 P.2d 918, 920 (Utah 1997) (citing *State v. Pena,* 869 P.2d 932 (Utah 1994)).

## ANALYSIS

### I. LIABILITY REFORM ACT

[5] ¶ 9 GenTec and Valley Asphalt argue that the trial court should have combined Bishop's negligence with that of his employer, Valley Asphalt, under the doctrine of respondeat superior. Alternatively, GenTec and Valley Asphalt also argue that if the doctrine of respondeat superior does not apply, the reapportionment provision of the LRA, section 78–27–39(2)(a), is unconstitutional under the Uniform Operation of Laws clause of the Utah Constitution, Utah Const. art. I section 24, and the Equal Protection Clause of the federal constitution, U.S. Const. amend. XIV, section 1. The first question before us therefore concerns the interaction between the LRA and the common law doctrine of respondeat superior.[1] Utah has adopted the common law, except for instances where the common law is contrary to or conflicts with the United States Constitution, the Utah Constitution, a statute, or Utah public policy. *See* Utah Code Ann. § 68–3–1 (2001). In determining whether a state statute pre-empts the common law, we have used the federal model for determining whether federal law pre-empts state law. *See Gilger v. Hernandez,* 2000 UT 23, ¶ 11, 997 P.2d 305. The United States Supreme Court has stated,

[i] Sometimes courts, when facing the pre-emption question, find language in the ... statute that reveals an explicit [legislative] intent to pre-empt [common] law. [ii] More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, courts must consider whether the ... statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent.

---

1. We note that the general application of respondeat superior requires an employer to be responsible for the actions of an employee where the employee, acting within the scope of her employment, injures a third party. In this case the employee is the injured party, not the party caus-ing injury, and, thus, use of respondeat superior under such circumstances would be problematic in any event. In this case, however, we need not address this problem because we conclude that the doctrine has been pre-empted, as discussed hereafter.

[a] A ... statute, for example, may create a scheme of [statutory] regulation "so pervasive as to make reasonable the inference that [the legislature] left no room for the [common law] to supplement it."

[b] Alternatively, [statutory] law may be in "irreconcilable conflict" with [the common] law. Compliance with both ..., for example, may be a "physical impossibility," or,

[c] the [common] law may "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of [the legislature]."

*Id.* (citing *Barnett Bank of Marion County v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (citations omitted)).

¶ 10 The Utah Legislature did not explicitly pre-empt the common law doctrine of respondeat superior when it passed the LRA. Therefore, we look to the statute's structure and purpose to determine whether it reflects an implied legislative intent to do so. We conclude that the state statute and the common law principle are in conflict, and that the common law must necessarily give way to the statute. Compliance with both is impossible. Additionally, the "[common] law ... 'stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of [the legislature].' " *Id.*

¶ 11 Application of the common law doctrine of respondeat superior to determine fault allocation in this case would undermine the legislature's objectives in enacting the LRA. Under the plain language of the statute, the only time the principle of respondeat superior could theoretically apply is in the initial apportionment of fault under section 78–27–39(1), in cases where the person seeking recovery is not an employee. As reallocation under the statute occurs only when the plaintiff is an employee of an immune employer, the principle of respondeat superior cannot operate to combine the employee's and the employer's fault in the initial allocation pursuant to section 78–27–39(1), or in the reallocation under section 78–27–39(2)(a). If it did, the effects of section 78–27–38(2), permitting recovery for an injured plaintiff from any defendant "whose fault, combined with the fault of persons immune from suit,

exceeds the fault of the [plaintiff]," Utah Code Ann. § 78–27–38(2)(2001), would be completely nullified. The combined fault of a defendant and an immune employer would *always* be greater than that of the plaintiff/employee if the plaintiff/employee's fault were to be attributed to the employer; the combined fault would, by definition, be 100 percent. The LRA must pre-empt the common law; otherwise sections 78–27–38(2) and 78–27–39(2)(a) would be without meaning or function.

¶ 12 More explicitly, we believe that the history of the allocation and reallocation provisions of the LRA reveals a legislative intent to override the operation of respondeat superior in this situation. Recent amendments to the LRA were undertaken by the legislature in specific response to· *Sullivan v. Scoular Grain Co. of Utah,* 853 P.2d 877 (Utah 1993). One of the issues addressed in *Sullivan* was whether a jury could apportion fault to an injured employee's employer where the employer was a party immune from suit. Upon a plain reading of the statute and a review of the legislative history, we determined that the LRA required apportionment both to immune parties and to defendants in order to prevent a "defendant [from being] held liable for damages in excess of its proportion of fault" in violation of the statutory language. *Id.* at 879. The dissent in *Sullivan* pointed out that the result would seriously curtail employee recovery, *id.* at 886 (Stewart, J., dissenting), but the majority felt obliged to follow the statutory language. *Id.* at 881. The legislature took notice of the case, and, in 1994 after vigorous debate, amended the LRA to provide for reallocation of ˙fault in cases where the fault of all parties immune from suit is less than 40 percent. Section 78–27–38 was amended by adding the language "under Section 78–27–39" to read, "No defendant is liable to any person seeking recovery for an amount in excess of the proportion of fault attributed to that defendant under Section 78–27–39." Utah Code Ann. § 78–27–38(3) (2001). The legislature thus balanced the factors for and against reallocation of fault and found that reallocation between the plaintiff and the defendant was a better policy than forcing the plaintiff

to bear the full burden of the immune party's fault. "Thus, in some instances the [revised] statutory scheme itself holds defendants liable for some percentage of fault initially attributable to a person immune from suit." *Field v. Boyer Co., L.C.*, 952 P.2d 1078, 1081–82 (Utah 1998).

¶ 13 Valley Asphalt's and GenTec's reliance on respondeat superior is in effect a challenge to the operation of the reapportionment provisions of the LRA, section 78–27–39(2)(a). Their position, if accepted, would recreate the *Sullivan* dilemma. Through the doctrine of respondeat superior, Valley Asphalt and GenTec seek to reject the legislature's explicit resolution of that dilemma. GenTec's and Valley Asphalt's contention that fault should not be reallocated to a defendant in excess of the liability originally attributed to that defendant is therefore unavailing in light of the legislature's 1994 amendment to the LRA.[2] The trial court correctly determined that the LRA preempted the common law.

¶ 14 GenTec and Valley Asphalt also argue that the reallocation provision of the LRA should be declared unconstitutional under the Uniform Operation of Laws provision of the Utah Constitution, art. I, section 24, and federal equal protection jurisprudence. Article I, section 24 of the Utah Constitution provides that "[a]ll laws of a general nature shall have uniform operation." "In scrutinizing a legislative measure under article I, § 24, we must determine whether the classification is reasonable, whether the objectives of the legislative action are legitimate, and whether there is a reasonable relationship between the classification and the legislative purposes." *Blue Cross & Blue Shield of Utah v. State*, 779 P.2d 634, 637 (Utah 1989).

¶ 15 GenTec and Valley Asphalt argue that the failure to include an injured employee's fault with that of his or her employer under the common law doctrine of respondeat superior creates an unconstitutional classification. They assert that this classification unduly burdens non-immune defendants because they may become liable for fault in excess of the fault initially attributed to them, at least where the immune party's fault is less than 40 percent.

¶ 16 As explained above, the legislature never intended the fault initially attributed to the injured employee to be combined, pursuant to respondeat superior, with the fault of the employer in the reallocation. The legislature recognized the injustice of a specific classification where an injured employee or a partially at-fault defendant third party would have to bear or share the burden of an immune employer's fault. The classification they settled on responds in a rational way to the conflict between protection of the interests of plaintiff-employees and of defendants. The amended statute strives to balance and protect the interests of both. Where the immune employer's fault is greater than 40 percent, the injured plaintiff-employee bears the burden of the employer's fault, but where the employer's fault is less than 40 percent, the injured plaintiff-employee proportionately shares the burden of the employer's fault with non-immune defendants. The 40 percent fault threshold is a reasonable cut-off point; the statutory scheme legitimately strives to balance and protect both defendants and injured employees. The classification therefore serves a legitimate legislative purpose: to balance economic burdens between an injured employee and a defendant where an immune employer is also at fault.

---

2. We note that another historic common law doctrine abandoned by the LRA, that of joint and several liability, would have made GenTec liable for the entire amount of the damages. GenTec would presumably agree that the result compelled by the LRA is better than the result under this common law principle. The legislature's decision to implement the LRA was premised on fairness. *See Floor Debate*, Utah Senate, 46th Leg.1986, General Sess., Senate Day 31, Records No. 63 (Feb. 12, 1986). Fairness includes not only fairness to the defendant, but also fairness to the plaintiff. The legislature made a policy judgment after *Sullivan* that illustrated the dilemma created by the original statute and determined that the best policy was to share the burden of an immune party's liability in certain cases between the plaintiff and the defendants instead of making the plaintiff bear the full burden. We cannot see how spreading this burden proportionally between parties is unconstitutional. Certainly, the result that GenTec and Valley Asphalt advocate would not be fairer.

¶ 17 Likewise, we conclude that the economic classification undertaken by the legislature here easily meets the "rational basis" standard required by the Equal Protection Clause of the federal constitution; the legislature's classification, as discussed above, was entirely reasonable and legitimate. Therefore, neither the Uniform Operation of Laws provision nor the Equal Protection Clause requires us to invalidate the LRA with respect to reallocation; the legislature's policy choice to reallocate the burden of an immune party's fault proportionally in some circumstances between defendants and plaintiffs is constitutional.

## II.  CONTRACT PROVISIONS

■ ¶ 18 Valley Asphalt argues that the trial court improperly granted summary judgment with respect to certain indemnification provisions found on the reverse side of the GenTec invoice for the equipment involved in Bishop's accident. We have previously stated that "[on] grounds of public policy, parties to a contract may not generally exempt a seller of a product from strict tort liability for physical harm to a user or consumer unless the exemption term 'is fairly bargained for and is consistent with the policy underlying that [strict tort] liability.' " *Interwest Constr. v. Palmer,* 923 P.2d 1350, 1356 (Utah 1996) (quoting Restatement (Second) of Contracts § 195(3) (1981)). Comment (c) to the Restatement (Second) of Contracts, section 195, indicates that agreements exempting a seller from strict products liability are unenforceable.[3]

■ ¶ 19 In the context of negligence, we have consistently held that an "indemnity agreement which purports to make a party respond for the negligence of another should be strictly construed." *Freund v. Utah Power & Light Co.,* 793 P.2d 362, 370 (1990). In construing such agreements, we have looked at the "objectives of the parties and the surrounding facts and circumstances" in interpreting the contractual language. *Id.* "In

general, the common law disfavors agreements that indemnify parties against their own negligence because 'one might be careless of another's life and limb, if there is no penalty for carelessness.' " *Hawkins v. Peart,* 2001 UT 94, ¶ 14, 37 P.3d 1062 (citing *Hyde v. Chevron U.S.A.,* 697 F.2d 614, 632 (5th Cir.1983)). Parties seeking to exempt themselves from tort liability must " 'clearly and unequivocally' express an intent to limit tort liability" within the contract. *See Interwest,* 923 P.2d at 1356 (quoting *DCR, Inc. v. Peak Alarm Co.,* 663 P.2d 433, 438 (Utah 1983)). "Without such an expression of intent, 'the presumption is against any such intention, and it is not achieved by inference or implication from general language....' " *Id.* (citation omitted). Furthermore, we will not infer an intention to indemnify against other kinds of liability, including strict liability, where such intention is not clearly expressed.

¶ 20 The two pertinent paragraphs found on the reverse side of the GenTec invoice read as follows:

INDEMNIFICATION

Customer shall indemnify and hold GenTec harmless from all expenses (including attorney's fees), claims, demands, suits, judgments, actions, costs, and liabilities (including without limitation those alleging GenTec's own negligence) *which arise from, relate to or are connected with the Customer's negligent possession, use, operation or resale* of the equipment and other goods described herein or any manuals, instructions, drawings or specifications related thereto.

(Emphasis added.)

INSTALLATION

Customer shall be solely responsible at its cost for the installation and erection of the equipment and other goods purchased. Although GenTec may in some cases provide a serviceman, data, manuals, instructions, drawings or specifications to aid Customer with installation or start-up.[sic] GenTec

---

3. In accord with the Restatement, the Utah Legislature promulgated section 78–15–7 on March 15, 2000, which voids any agreement to exempt a seller of a product from strict products liability on grounds of public policy. Section 78–15–7 is inapplicable to the current case because the accident here occurred before the new section was adopted. The statute nonetheless reflects the legislature's view of public policy on this question.

assumes no responsibility for proper installation or support of the equipment or other goods when erected and disclaims any express or implied warranties with respect to such installation or support. Whether or not data manuals, instructions, drawings or specifications are provided or a serviceman aids in the installation, *Customer shall indemnify and hold GenTec harmless from all expenses (including attorney's fees), claims, demands, suits, judgments, actions, costs, and liabilities (including without limitation those alleging GenTec's own negligence) which may arise from, relate to, or be connected with damage or personal injury arising out of the installation, erection, start-up, or use of the equipment and other goods purchased* (including any manuals, instructions, or drawings related thereto).

(Emphasis added.)

¶ 21 The plain reading of the paragraph entitled "INDEMNIFICATION" restricts Valley Asphalt's agreement to indemnify to those situations where Valley Asphalt itself is negligent. Thus, where Valley Asphalt is not negligent, Valley Asphalt has no duty to indemnify GenTec at all. Furthermore, there is no reference in the indemnification language to products liability. GenTec included a parenthetical clause to indicate that "liabilities" specifically included GenTec's own negligence, but we will not read that reference to include products liability, in view of the principles of strict construction to which we adhere in this area.

¶ 22 Analysis of the paragraph entitled "INSTALLATION" results in a similar conclusion. In the relevant portion of the "INSTALLATION" paragraph, GenTec purports to disclaim any liability for damage or personal injury "arising out of the installation, erection, start-up, or use of the equipment." That language must be read in accordance with the paragraph as a whole, which notes that Valley Asphalt is solely responsible for installation. Thus, whereas the INDEMNIFICATION paragraph purports to protect GenTec generally from any liability for negligence when injuries "arise from [Valley Asphalt's] negligent possession, use, operation or resale" of equipment, the INSTALLA-TION paragraph specifically protects GenTec for injuries arising out of "the installation, erection, start-up, or use" thereof. By definition, injuries arising from Valley Asphalt's installation could not be attributed to the condition of the product when sold (products liability), and therefore the INSTALLA-TION paragraph cannot be read to provide indemnification for products liability. Thus, GenTec is not entitled to indemnification for Bishop's products liability claim.

■■■ ¶ 23 GenTec has also argued on appeal that the plaintiff's cause of action against it was tried to the jury as both a products liability claim and a negligence claim, and that it is therefore entitled to the protections in the INDEMNIFICATION paragraph for negligence. We disagree. Bishop's complaint against GenTec contains only one cause of action, for "Products Liability (Strict Liability in Tort)." The complaint alleges a defective and dangerous product, and asserts that the product was defectively designed and manufactured. It also alleges, as part of the defective design theory, that GenTec "so negligently, carelessly and recklessly designed, manufactured, ... sold, ... serviced and failed to warn relative to said silo system ... so as to directly and legally cause the accident, injuries and damages to plaintiff as described herein, ... as a result of the unreasonably dangerous defects in the silo system design, the plaintiffs' husband and father, Douglas J. Bishop, was fatally injured."

¶ 24 In several memoranda to the trial court, and now on appeal, GenTec cites the foregoing language as evidencing a theory of recovery for ordinary negligence, which it argues should bring Bishop's claim within the negligence language of the INDEMNIFICA-TION & INSTALLMENT provisions of the contract. GenTec has misapprehended the applicable principles of products liability law.

■■■ ¶ 25 Products liability always requires proof of a defective product, which can include "manufacturing flaws, design defects, and inadequate warnings regarding use." *Grundberg v. Upjohn Co.*, 813 P.2d 89, 92 (Utah 1991). Alternative theories are available to prove different categories of defective

product, including negligence, strict liability, or implied warranty of merchantability. *See, e.g.,* Restatement (Third) of Torts: Product Liability § 2 cmt. n (1997). Alternative theories entail different evidentiary burdens. For example, proof of a defect under a negligent manufacture theory will necessitate proof that the defective condition of the product was the result of negligence in the manufacturing process, or proof that the manufacturer knew or should have known of the defective condition, whereas these elements are unnecessary under strict liability or breach of warranty theories. Whatever the theory, however, the defendant's liability is for the defective product, and not merely for any underlying negligence. *See generally,* 63 Am.Jur.2d Products Liability § 8 (1996) ("In a products liability action, a defect in a product may consist of a mistake in manufacturing, improper design, or the inadequacy or absence of warnings regarding the use of the product.")

¶ 26 Thus, allegations of negligence contained in a claim for products liability do not transform the claim into one for ordinary negligence. GenTec has overlooked this principle in construing the import of the Special Verdict Form returned by the jury in this case. The Verdict Form asked: "1. When the product, the silo, left the defendant Gen-Tec, was it in a defective condition, making the product unreasonably dangerous to the decedent?" and "3. Was the manufacturer, GenTec, negligent?" Both questions were answered in the affirmative by the jury, and GenTec now argues that the answer to question three demonstrates that this case was "submitted to the jury on negligence theories." We conclude, however, that the reference to negligence in question three could only have been connected to the plaintiff's theory of a product defect based on negligence, as an alternative to its theory of a product defect based on strict liability, which was addressed by question one. At least one state has expressly held that the adoption of strict liability doctrine does not abolish the theory of "product liability negligence" as proof of a product defect, *Big Rivers Elec. Corp. v. General Elec. Co.,* 820 F.Supp. 1123, 1127 (S.D.Ind.1992), and no argument has been made in this case that the theories are

mutually exclusive or inconsistent. *See also Monsanto Co. v. Reed,* 950 S.W.2d 811, 814 (Ky.1997). Therefore, we reject GenTec's argument that this claim sounded in negligence and was covered by the invoice's indemnification language.

## III. JURY VERDICT

¶ 27 Bishop appeals the trial court's denial of his motion to amend the jury verdict pursuant to Utah R. Civ. P. 60. Bishop also appeals the trial court's decision to strike the juror affidavits. GenTec properly argues that we should review a trial court's determination under Utah R. Civ. P. 59 and 60(b) pursuant to an abuse of discretion standard. We do not address rule 59, however, as rule 59 was not argued by Bishop to the trial court.

¶ 28 As noted above, Bishop originally filed a motion with the trial court pursuant to Utah R. Civ. P. 60(a) or (b) to amend the jury verdict to correct a clerical error; alternatively, the motion asked the court to amend the jury verdict pursuant to Utah R. Civ. P. 59. In spite of the caption of the motion referring to the alternative theory, Bishop actually argued at the hearing on the motion only for a correction of the jury verdict under rule 60. Further, Bishop's counsel orally conceded at the hearing that. no tenable basis for relief existed under rule 59. "[I]t is the substance, not the labeling, of a motion that is dispositive in determining the character of the motion." *Bair v. Axiom Design, L.L.C.,* 2001 UT 20, ¶ 9, 20 P.3d 388. Thus, even though the motion was captioned as either a rule 60 or a rule 59 motion, we conclude that its substance requires us to treat it as a rule 60 motion to correct a clerical error.

¶ 29 Basing its ruling on *Rosenlof v. Sullivan,* 676 P.2d 372 (Utah 1983), which dealt with a rule 59 motion for a new trial, the trial court denied Bishop's motion and struck the juror affidavits pursuant to rule 59. The trial court did not state its grounds for denying Bishop's motion under rule 60, other than explaining that it believed Bishop's motion was substantively a motion to impeach the jury verdict pursuant to rule 59. We dis-

agree with the trial judge's characterization of the substance of the motion and conclude that Utah R. Civ. P. 60 is determinative, that the affidavits were admissible, and that the jury verdict should be amended to reflect the true intent of the jury.

¶ 30 "The correction contemplated by rule 60(a) must be undertaken for the purpose of reflecting the actual intention of … the parties." *Lindsay v. Atkin,* 680 P.2d 401, 402 (Utah 1984). "[I]n this broad approach to correctability under Rule 60(a), it matters little whether an error was made by the court clerk, the jury foreman, counsel, a party, or the judge himself, so long as it is clearly a formal error that should be corrected in the interest of having judgment, order, or other part of the record reflect what was done or intended." *Stanger v. Sentinel Sec. Life Ins. Co.,* 669 P.2d 1201, 1206 (Utah 1983) (quoting Jean F. Rydstrom, Annotation, *Construction of Rule 60(a) of Federal Rules of Civil Procedure Authorizing Correction of Clerical Mistakes in Judgements, Orders, or other Parts of Record, and Errors Therein,* 13 A.L.R. Fed. 794 (1972)).

¶ 31 Prior to the adoption of the Utah Rules of Civil Procedure, we addressed the issue of whether a trial court could correct a jury verdict to reflect the true intent of the jury. In *Moulton v. Staats,* 83 Utah 197, 27 P.2d 455 (1933), we allowed the trial court to correct a jury verdict to reflect the true intent of the jury. In *Suniland Corp. v. Radcliffe,* 576 P.2d 847 (Utah 1978), Justice Maughan argued that juror affidavits were admissible "to demonstrate what verdict was actually agreed upon." *Id.* at 850 (Maughan, J., dissenting).[4] Similarly we noted in *Brown v. Johnson,* 24 Utah 2d 388, 472 P.2d 942 (1970), that "[w]hile jurors may not by affidavit or otherwise impeach their verdict, they may give proof to explain it." *Id.* at 946 n. 1 More recently, the Tenth Circuit Court of Appeals has also determined that, under the Federal Rules of Civil Procedure, a jury verdict may be corrected to reflect the true intent of the jury. *See Eastridge Dev. Co. v. Halpert Assocs., Inc.,* 853 F.2d 772, 783 (10th Cir.1988).[5]

¶ 32 Bishop is not arguing in this case that the mistake was a judicial error made in rendering the judgment, but rather that the error was clerical and was made by the jury in "recording the judgment as rendered." We agree that accurately recording the intent of the jury in its calculation of the damage award constitutes correction of a clerical error, not a judicial error. "The distinction between judicial error and clerical error … depends on whether it was made in rendering the judgment or in recording the judgment as rendered." *Richards v. Siddo-*

---

4. The court did not decide this issue as it was not properly before the court on appeal.

5. A split of authority currently exists over whether a court can admit evidence, including juror affidavits and testimony, to determine whether the jury verdict reflects the true intent of the jury and to correct the jury verdict. Jurisdictions admitting evidence to correct a jury verdict include: *United States v. Stauffer,* 922 F.2d 508, 513 (9th Cir.1990) (criminal case); *Karl v. Burlington N. R.R. Co.,* 880 F.2d 68, 73 (8th Cir. 1989) (narrowly interpreting the clerical error exception to apply to an error in transmission of the jury verdict); *Eastridge Dev. Co. v. Halpert Assoc., Inc.,* 853 F.2d 772, 783 (10th Cir.1988); *Attridge v. Cencorp Div. of Dover Techs. Int'l, Inc.,* 836 F.2d 113, 116 (2d Cir.1987); *Umphrey v. Sprinkel,* 106 Idaho 700, 682 P.2d 1247, 1254–55 (1983); *Latino v. Crane Rental Co.,* 417 Mass. 426, 630 N.E.2d 591, 593 (1994); *Moisakis v. Allied Bldg. Prods. Corp.,* 265 A.D.2d 457, 697 N.Y.S.2d 100, 105–06 (1999) (noting that juror evidence can be used to, correct clerical errors, but not to determine the extent of juror confusion regarding the verdict as rendered); *Newport Fisherman's Supply Co. v. Derecktor,* 569 A.2d 1051, 1052–53 (R.I.1990); *State v. Williquette,* 190 Wis.2d 677, 526 N.W.2d 144, 151 (1995) (criminal case, but extended by the Wisconsin Supreme Court to both civil and criminal cases); *see also* 8 Wigmore, Evidence § 2355 (Chadbourne rev.1978) (discussing the admissibility of evidence to correct a jury verdict); J.F. Ghent, Annotation, *Competency of Juror's Statement or Affidavit to Show That Verdict in Civil Case Was Not Correctly Recorded,* 18 A.L.R.3d 1132 § 3 (1968) (discussing cases that allow clerical error exception).

Jurisdictions not admitting evidence to correct a jury verdict include: *Plummer v. Springfield Term. Ry.,* 5 F.3d 1, 3 (1st Cir.1993); *Cyr v. Michaud,* 454 A.2d 1376, 1383–84 (Me.1983); *McKinney v. Smith,* 63 N.M. 477, 322 P.2d 110, 111 (1958); *see also* J.F. Ghent, Annotation, *Competency of Juror's Statement or Affidavit to Show That Verdict in Civil Case Was Not Correctly Recorded,* 18 A.L.R.3d 1132, §§ 6–7 (1968) (discussing cases that do not allow clerical error exception).

*way,* 24 Utah 2d 314, 471 P.2d 143, 145 (1970) (quoting 46 .Am.Jur.2d *Judgments* § 202). Accordingly, the juror affidavits should have been admitted. On remand the jury verdict should be corrected to reflect the true intent of the jury by increasing the general and special damages to $1,000,000 and $1,067,000 respectively, and then deducting Bishop's percentage of fault as required by the LRA.

## CONCLUSION

¶ 33 We affirm the trial court's holding that the LRA precludes the application of the common law doctrine of respondeat superior; the legislature has pre-empted the common law. We reverse the trial court's determination on summary judgment that Valley Asphalt must indemnify GenTec for all liability. Finally, we reverse the trial court's decision to strike the juror affidavits and instruct the court below to increase the general and special damages award to $1,000,000 and $1,067,000 respectively, before deducting Bishop's percentage of fault.

¶ 34 Justice DURRANT, Justice WILKINS, and Judge BENCH concur in Justice DURHAM's opinion.

¶ 35 Associate Chief Justice RUSSON concurs in the result.

¶ 36 Having disqualified himself, Chief Justice HOWE did not participate herein; Court of Appeals Judge RUSSELL W. BENCH sat.