2024 UT App 56

# THE UTAH COURT OF APPEALS

AARON SAMPSON,
Appellant,
*v.*
HB BOYS, LC,
Appellee.

Opinion
No. 20221003-CA
Filed April 18, 2024

Third District Court, Salt Lake Department
The Honorable Robert P. Faust
No. 210900310

Gregory W. Stevens, Attorney for Appellant

Robert L. Janicki, Michael L. Ford, and Thomas M.
Alldridge, Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1      A couple of interactions soured the relationship between
the shift supervisor at a Burger King and a customer, Aaron
Sampson, who in addition to requesting a new burger or a refund,
filmed his interactions with the shift supervisor (Shift Supervisor).
Running out of patience during a second interaction, the soon-to-
be-fired Shift Supervisor assailed Sampson with racist slights and
solicited a nearby acquaintance to assault him. Sampson
subsequently sued the franchise owner, HB Boys, LC (HBB),
under the Utah Civil Rights Act (UCRA)—specifically under the
private right of action provision. HBB moved for summary
judgment, claiming the common law doctrines of respondeat
superior and agency did not apply in these circumstances and
therefore it could not be held liable under the UCRA. The district

court agreed and granted the motion. Sampson appeals, and we reverse.

BACKGROUND[1]

¶2     In February 2019, Sampson was assaulted at a Burger King owned by HBB. To understand this incident, we must first go back to another incident that took place about two weeks prior when Sampson received an undercooked cheeseburger at the same Burger King. After Sampson took several bites of his burger, he realized that it was not cooked through and approached the front counter to ask for a new one or a refund. The employee left the front counter to take the issue to Shift Supervisor at the back of the restaurant. Sampson overheard Shift Supervisor in a raised voice respond, "He can't have another burger," and, "If he wants a burger, I'll cook him a burger." Concerned there would be a problem, Sampson pulled out his phone to record as Shift Supervisor made her way to the counter. Shift Supervisor asked him what he wanted, and Sampson said that he would like a refund. Shift Supervisor told him, "You can't be eating the stuff and then expect to get a refund." Sampson explained that he didn't eat the burger because the meat was red and once again stated that he would like a refund. Shift Supervisor again told him he could not have one, so Sampson asked for her name, which she refused to give him. Sampson then asked for a phone number to file a complaint, and Shift Supervisor pushed a receipt with the number into his chest, while also trying to grab his phone. Shift

---

1. We recite the facts of the case and draw all reasonable inferences in the light most favorable to Sampson as the nonmoving party. *Ockey v. Club Jam*, 2014 UT App 126, ¶ 2 n.2, 328 P.3d 880 ("In reviewing a district court's grant of summary judgment, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and recite the facts accordingly." (cleaned up)).

Supervisor threatened to call the police, at which point Sampson left the restaurant.

¶3     Sampson considered filing a complaint with both the police and HBB, but before he could do so, a second incident occurred.

¶4     Two weeks after the first encounter at Burger King, Sampson and his cousin (Cousin) returned to the same restaurant to get food before the Super Bowl. Sampson waited in the car while Cousin ran in to grab the food. After waiting about ten minutes for Cousin to return, Sampson went into the restaurant to see what was taking so long.

¶5     When Cousin had attempted to order, Shift Supervisor had confronted him about filming her "again." Cousin explained that she must have him confused with someone else. As their conversation went on, a large man came to the counter and confronted Cousin in a "threatening manner." Cousin continued to tell the pair that they had the wrong person and he just wanted to order his food. Shift Supervisor eventually took his order, and Cousin stepped to the side to wait for what seemed to him like an intentionally longer than usual amount of time. It was at this point that Sampson entered the restaurant.

¶6     Shift Supervisor recognized Sampson and asked if he was there to record her again. Sampson said he didn't know what she was talking about. Shift Supervisor responded by directing a racial epithet at Sampson and calling him a "fool" before returning to the drive-through area. Sampson again began recording the incident. He asked Shift Supervisor, "Why are you calling me out a name like that? Why are you calling me out a name in front of these customers?" Shift Supervisor called him a fool again, and Sampson again asked why she was calling him names. Shift Supervisor then turned to him and said, "Don't have my brother beat you up." Sampson dismissed the comment and began to leave with Cousin. As they made their way to the exit,

the same large man from before, a friend of Shift Supervisor and the "brother" she had referred to (Friend), began exchanging words with Sampson. Friend told Sampson to get his "black ass out of [t]here," to which Sampson responded "fuck you" as he continued leaving the restaurant. Shift Supervisor then told Friend more than once to "take care of him." Following Shift Supervisor's request, Friend assaulted Sampson inside the restaurant and continued to beat him outside in the parking lot. Sampson called the police, who cited Friend for assault.

¶7    The day after the assault, Sampson called HBB's district manager, informing him of the incident. The district manager conducted a brief investigation before terminating Shift Supervisor two days later.

¶8    At the time of both incidents, Shift Supervisor was the shift supervisor and neither the manager nor the assistant manager was present. In the HBB policy manual, the role of a shift supervisor is as follows:

> The Shift Supervisor (SS) supports the Restaurant Manager in ensuring delivery on the Guest Experience through managing the daily operations of a shift in a single restaurant. The SS helps manage financial controls, operations, people development, customer service and compliance during shift for desired restaurant outcomes (i.e. increased sales, profitability and employee retention). Within the scope of the Shift Supervisor role, the SS has accountability for restaurant operations in the absence of the Assistant Manager and Restaurant Manager.

¶9    Prior to starting her employment, Shift Supervisor received training on HBB's policies and signed an acknowledgment that she both understood and would abide by them. The policies included the following language:

4.1.1 It is the Company's policy to respect the rights of all individuals regardless of the individual's race, color, sex, age, religion, national origin or disability. The Company expects its employees to respect the dignity and equality of all people.

. . . .

4.2.1 . . . The Company is also committed to providing its guests with an enjoyable setting that is free from offensive, abusive or unwelcome conduct that might interfere with their dining experience. Accordingly, employees are prohibited from engaging in conduct which creates an intimidating, hostile or offensive environment, including . . . racial harassment[] or other types of harassment.

. . . .

4.2.3 Racial harassment involves the use of derogatory, unwelcome or offensive racially-oriented jokes, comments or conduct . . . .

Following her promotion to shift supervisor, Shift Supervisor signed an acknowledgment that she had participated in a training reviewing the policies.

¶10 In January 2021, Sampson filed this lawsuit, alleging that HBB was liable for Shift Supervisor's behavior under the UCRA. *See* Utah Code §§ 13-7-1 to -4. Sampson also alleged that HBB was vicariously liable for Shift Supervisor's behavior under the common law doctrine of respondeat superior.[2]

---

2. Sampson's amended complaint also included claims against HBB for negligent employment and negligent infliction of emotional distress, which Sampson agreed should be dismissed

(continued…)

HBB filed a motion for summary judgment, arguing that Sampson could prove neither that HBB discriminated against him nor that HBB was vicariously liable for Shift Supervisor's acts. The district court granted HBB's motion for summary judgment.

¶11 The court based its dismissal of Sampson's claim of discrimination under the UCRA on a determination that there was no genuine issue of material fact that (1) HBB had non-discrimination policies in place and did not tolerate the violation of those policies; (2) Shift Supervisor completed all required training and signed the acknowledgment that she understood and would abide by those policies; (3) Sampson pointed to no actual authority that HBB gave to Shift Supervisor to act in the manner that she did; and (4) there could be no implied authority where the alleged conduct was "explicitly prohibited." Thus, the district court determined that common law principles applied to the UCRA and concluded that Sampson's claim failed under general agency principles.

¶12 The court also dismissed Sampson's claim that HBB was vicariously liable for Shift Supervisor's actions as a matter of law because it determined that "no reasonable jury could conclude that [Shift Supervisor's] authority to control the restaurant involved the authority to call a guest racially derogatory names and then have a third-party assault that guest." The court concluded, "This conduct is clearly not of the general kind she was employed to perform and cannot be viewed as motivated at all to serve [HBB]'s interests."

¶13 Sampson now appeals.

---

at the summary judgment hearing. Therefore, these claims are not a part of this appeal.

ISSUES AND STANDARD OF REVIEW

¶14    Sampson argues that the district court erred in granting HBB's summary judgment motion for two reasons. First, Sampson contends that the district court incorrectly interpreted the UCRA to apply common law agency principles in finding that Shift Supervisor had no implied authority to act as she did on behalf of HBB—and that if a common law principle is required by the UCRA, the appropriate doctrine is respondeat superior. Second, Sampson argues that the court erred in finding that HBB was not vicariously liable under the doctrine of respondeat superior as Shift Supervisor's conduct was outside the scope of her employment. "We review the district court's decision to grant or deny summary judgment for correctness, viewing the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Nelson v. Target Corp.*, 2014 UT App 205, ¶ 11, 334 P.3d 1010 (cleaned up).

ANALYSIS

I. Applying the UCRA

¶15    Section 13-7-3 of the UCRA states,

> All persons within the jurisdiction of this state are free and equal and are entitled to full and equal accommodations, advantages, facilities, privileges, goods and services in all business establishments and in all places of public accommodation, and by all enterprises regulated by the state of every kind whatsoever, without discrimination on the basis of race, color, sex, pregnancy, religion, ancestry or national origin.

Utah Code § 13-7-3. The UCRA then creates the following public rights:

> Any business establishment or place of public accommodation or enterprise regulated by the state in which a violation of the rights provided in [s]ection 13-7-3 of this chapter occurs is a public nuisance. The operator of any such business establishment or place of public accommodation or enterprise regulated by the state is guilty of maintaining a public nuisance and may be enjoined as hereinafter provided.

*Id.* § 13-7-4. The UCRA also expressly provides for a private right of action:

> Any person who is denied the rights provided for in [s]ection 13-7-3 shall have a civil action for damages and any other remedy available in law or equity against any person who denies him the rights provided for in [s]ection 13-7-3 or who aids, incites or conspires to bring about such denial.

*Id.* § 13-7-4(3). Finally, the UCRA defines a person as "an individual, partnership, association, organization, corporation, labor union, legal representative, trustee, trustee in bankruptcy, receiver, and other organized groups of persons." *Id.* § 13-7-2.

¶16 In its grant of summary judgment for HBB, the district court determined that the private cause of action section, *see id.* § 13-7-4(3), implicitly incorporates common law principles—specifically general agency principles—in order for an individual, like Sampson, to be able to satisfy the elements of a cause of action against a covered business establishment. But the court concluded that the undisputed facts showed that Sampson could not meet the requirements of common law agency principles as a matter of law. While we agree that common law principles apply here, we disagree with the district court on both the proper analysis to reach that conclusion and which common law principles apply.

And we hold that genuine issues of material fact should have precluded a grant of summary judgment.

¶17 In considering whether common law principles apply in this statutory context, we first analyze whether common law principles are expressly incorporated. *M.J. v. Wisan*, 2016 UT 13, ¶¶ 45–48, 371 P.3d 21. Next, we determine whether common law principles are statutorily preempted. *Bishop v. GenTec Inc.*, 2002 UT 36, ¶ 10, 48 P.3d 218. Finally, we review whether the application of common law principles is consistent with the statute at issue. *Id.*

¶18 We first address express incorporation. In *M.J.*, our supreme court faced a similar question when determining whether, under the Utah Uniform Trust Code, a trust could be held vicariously liable for a trustee's acts under the doctrine of respondeat superior. 2016 UT 13, ¶¶ 45–48. The statute provided that "a trust is liable for the trustee's acts performed in the course of administering the trust." *Id.* ¶ 47 (cleaned up). Neither Utah statute nor caselaw defined this standard, and the court found caselaw from other jurisdictions too limited to be helpful. *Id.* Yet the court determined that the "terms of the statute, in context, [were] quite clear" because the phrase "[*i*]*n the course of*" referred to "the traditional formulation of the standard for vicarious liability under" respondeat superior. *Id.* ¶ 48. Accordingly, the court interpreted the statute as "incorporating the established" common law "standard of respondeat superior liability." *Id.* (cleaned up). Here, however, no similar language exists in the UCRA. And the parties do not point us to any other language from which we could conclude that common law principles were considered. Therefore, as far as we can determine, common law principles are not expressly incorporated into the UCRA.

¶19 Next, we consider whether common law principles are statutorily preempted. In *Bishop*, our supreme court addressed "the interaction between [Utah's Liability Reform Act] and the

common law doctrine of respondeat superior." 2002 UT 36, ¶ 9. The court noted that Utah had adopted the common law so long as it did not conflict with the United States or Utah Constitutions, federal or Utah statutes, "or Utah public policy." *Id.*; *see also* Utah Code § 68-3-1. Thus, our supreme court in *Bishop* had to determine whether the statute preempted the common law. 2002 UT 36, ¶ 9. The court's analysis asked (1) whether the statutory language explicitly preempted the common law, which language "more often . . . does not appear, or does not directly answer the question," and (2) whether the "statute's structure and purpose, or nonspecific statutory language, nonetheless reveal[ed] a clear, but implicit, [preemptive] intent." *Id.* (cleaned up). With no explicit preemptive language, the court nonetheless determined that the statute implicitly preempted the common law doctrine of respondeat superior. *Id.* ¶ 10. The court found implied legislative intent from the legislature's objectives in enacting the statute and the fact that if respondeat superior applied, certain sections of the statute "would be without meaning or function." *Id.* ¶ 11.

¶20 Here, the UCRA neither expressly nor implicitly preempts application of the common law. Indeed, the parties do not point to any language that can be construed as preempting the common law. Moreover, the parties do not identify any tension between any provisions of the UCRA and the common law. Accordingly, we conclude that the UCRA itself does not preempt the application of the common law.

¶21 Finally, we consider whether the application of common law principles is otherwise consistent with the statute. Two points buttress a conclusion that common law principles are consistent with the UCRA. First, the language employed by the UCRA supports the conclusion that common law principles should apply. It is clear from the UCRA that a private right of action is to be available and that the UCRA as a whole, including the private right of action, is to be construed "liberally" in the interest of justice. *See* Utah Code §§ 13-7-1, -4(3). The UCRA provides that a

person may make a claim for discrimination against "any *person* who denies him the rights provided for in [s]ection 13-7-3 or who aids, incites or conspires to bring about such denial." *Id.* § 13-7-4(3) (emphasis added). The UCRA includes a business entity, such as HBB, in its definition of "person." *Id.* § 13-7-2(2). It is self-evident that while a business entity like HBB meets the statutory definition of person, a business entity can only act through others, i.e., its employees. Thus, defining a business entity as a person subject to liability under the UCRA's private right of action assumes a legal mechanism whereby an entity can be liable for its employee's actions, which in turn implicates vicarious liability. Applying the doctrine of respondeat superior allows us to apply the UCRA to a business entity as it requires and enables us to carry out the legislative intent and purpose of the UCRA, which is "to assure all citizens full and equal availability of all goods, services and facilities offered by business establishments and places of public accommodation . . . without discrimination because of race." *Id.* § 13-7-1.[3]

---

3. While the district court correctly determined that common law principles apply here, its application was incorrect. The court found that Sampson could not satisfy the elements of a discrimination claim under the UCRA because he "point[ed] to no actual authority [HBB] gave to [Shift Supervisor] to conduct herself in the manner alleged." Actual authority is an agency doctrine that "relates to a principal's manifestations to the agent." *Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 21, 345 P.3d 531. Actual authority can be either express or implied. *Drew v. Pacific Life Ins. Co.*, 2021 UT 55, ¶ 54, 496 P.3d 201. "Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf. Implied authority includes acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id.*

(continued…)

¶22 Second, applying common law principles, particularly the doctrine of respondeat superior, to the UCRA is consistent with federal cases that have applied respondeat superior to analogous federal public accommodation and civil rights statutes to hold private employers vicariously liable for the acts of their employees. *See, e.g.*, *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 403–04 (1982) (O'Connor, J., concurring) (emphasizing that "nothing in the Court's opinion prevents the respondents from litigating the question of the employers' liability under [42 U.S.C. § 1981] by attempting to prove the traditional elements of respondeat superior" because the Court determined only that the petitioners could not be held vicariously liable due to a failure of the trial court to make findings that support the application of the doctrine (cleaned up)); *Arguello v. Conoco, Inc.*, 207 F.3d 803, 810–12 (5th Cir. 2000) (discussing general agency principles in the context of a section 1981 claim and reversing summary judgment on scope of employment); *Miller v. Bank of Am.*, 600 F.2d 211, 213 (9th Cir. 1979) (applying respondeat superior to section 1981 and section 2000 claims); *McKinnon v. YUM! Brands, Inc.*, No. 1:15-cv-00286, 2017 WL 3659166, at *6–7 (D. Idaho Aug. 24, 2017) (applying respondeat superior to section 1981 and section 2000 claims).[4]

---

(cleaned up). Here, neither express nor implied authority exists as HBB had clear policies, which Shift Supervisor was trained on multiple times, against discrimination and mistreatment of its customers. Therefore, we agree with Sampson that the correct doctrine to apply here is respondeat superior.

4. HBB concedes that federal "cases recognize vicarious liability under 42 U.S.C. § 1981." However, HBB attempts to distinguish the cases by arguing that the decisions are based on the language of federal statutes, which "do not have any controlling authority over a claim under the [UCRA]." HBB is, of course, correct that

(continued…)

federal cases do not having binding authority in construing a Utah statute, but those authorities are still persuasive. When addressing an issue that has not yet been decided by our courts, looking at the decisions of other jurisdictions informs our analytical process. For example, the United States Supreme Court's inclination to apply respondeat superior to public accommodation statutes is particularly informative and persuasive here. *See General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 403–04 (1982) (O'Connor, J., concurring).

HBB further argues that it is significant that some federal courts do not recognize the application of respondeat superior under 42 U.S.C. § 1983. *See Monell v. Department of Social Services*, 436 U.S. 658, 691–92 (1978) (denying the application of respondeat superior to public employers under section 1983); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying the decision in *Monell* to private employers). But we conclude that this actually supports our determination that respondeat superior is the appropriate doctrine to apply to the UCRA. Claims under section 1983 involve an entirely different analysis—such as the "under color of any law" analysis, *Monell*, 436 U.S. at 691–92 (cleaned up)—from public accommodation statutes like section 1981, with a cause of action reading similarly to the UCRA's. The United States Supreme Court itself alludes to the significance of this difference by at least indicating that it will apply respondeat superior to section 1981 claims, which are more similar to the UCRA, and not section 1983 claims. *See General Bldg. Contractors Ass'n*, 458 U.S. at 403–04 (O'Connor, J., concurring) (indicating, at least in Justice O'Connor's concurrence, that the Court would apply respondeat superior to section 1981 claims); *cf. Monell*, 436 U.S. at 691 ("In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under section 1983 on a *respondeat superior* theory.").

¶23 For all these reasons, we conclude that common law principles, and particularly the doctrine of respondeat superior, apply in the context of UCRA cases.

## II. Applying Respondeat Superior

¶24 Under the common law agency doctrine of respondeat superior, "an employer can be held vicariously liable for the torts of her employees." *Burton v. Chen*, 2023 UT 14, ¶ 15, 532 P.3d 1005. Employers are "liable for an employee's actions that occur within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." *Id.* (cleaned up). Employee's acts are within the scope of employment if "(1) the employee's conduct is of the general kind the employee is employed to perform and (2) the employee's acts were motivated, at least in part, by the purpose of serving the employer's interest." *Aguila v. Planned Parenthood of Utah*, 2023 UT App 49, ¶ 21, 530 P.3d 959 (cleaned up). This determination is a question of fact that "must be submitted to a jury whenever reasonable minds may differ as to whether the employee was at a certain time involved wholly or partly in the performance of his employer's business or within the scope of employment." *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1040 (Utah 1991) (cleaned up). We conclude that, here, reasonable minds could differ as to whether Shift Supervisor was acting within the scope of her employment, so the issue is not appropriate for summary judgment.

¶25 Regarding the first factor, the "scope of authority refers to those acts which are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 26, 61 P.3d 1009 (cleaned up). Here, as shift supervisor, Shift Supervisor was in charge of "tak[ing] care of the customers and mak[ing] sure

everything [was] running smooth with the shifts throughout," was given "control over the restaurant" in the absence of the assistant manager or store manager, and managed "the daily operations of a shift," including "people development, customer service and compliance." Additionally, on more than one occasion, the restaurant had "people who [came] in there acting crazy, especially [during] night shifts." Therefore, given the frequency of dealing with difficult customers, and given that Shift Supervisor was charged with making sure the shifts ran smoothly, reasonable minds might differ as to whether Shift Supervisor's conduct while handling a customer like Sampson, as improper as it might have been, was "of the general kind the employee is employed to perform." *See Drew v. Pacific Life Ins. Co.*, 2021 UT 55, ¶ 56, 496 P.3d 201 (cleaned up).

¶26    Moreover, Shift Supervisor herself treated the February incident as one that was in the normal course of her employment. Once police arrived, she contacted her manager to let her know what had transpired, which was also what she did after the first incident with Sampson at the restaurant and was what she and all other shift supervisors did on a regular basis "if they need[ed] something."

¶27    With regard to whether an employee's acts are at least in part motivated by serving the employer's interests, "[t]he notion that an employee's illegal conduct can never (i.e., as a matter of law) fall within the course and scope of employment is simply not supported by our caselaw." *Aguila*, 2023 UT App 49, ¶ 21. And "an employer is vicariously liable for an employee's intentional tort if the employee's purpose in performing the acts was either wholly or only in part to further the employer's business, even if the employee was misguided in that respect." *Id.* (cleaned up); *see id.* ¶¶ 23–24 (finding reasonable minds can differ as to whether an employer was vicariously liable for an employee's act of publicizing a patient's private healthcare information); *Clark v. Pangan*, 2000 UT 37, ¶¶ 8, 19, 998 P.2d 268 (holding that "the

intentional tort of battery is not outside the scope of employment as a matter of law" and citing numerous cases to demonstrate that the court "has long recognized that an employer can be vicariously liable for the intentional tortious acts of employees under the theory of respondeat superior if those acts are conducted within the scope of employment").

¶28   As shift supervisor, Shift Supervisor was charged with managing the operation of the restaurant during the shift to achieve "desired restaurant outcomes (i.e. increased sales, profitability and employee retention)." Thus, reasonable minds also may differ as to whether her tortious actions, as misguided as they might have been, were at least motivated "in part" to benefit HBB. Certainly, maintaining a smoothly running shift without the disturbance of a problematic customer can yield "desired restaurant outcomes." And whether HBB had anti-discrimination policies in place[5] that were designed to preclude Shift Supervisor's alleged discriminatory behavior is not, in and

---

5. While the district court's decision to grant summary judgment under both the UCRA and respondeat superior claims was greatly influenced by the fact that HBB had anti-discrimination policies in place, HBB itself did not rely on those policies in terminating Shift Supervisor's employment. HBB terminated Shift Supervisor due to her handling of the cheeseburger incident during Sampson's first visit to the restaurant; indeed, HBB concluded Sampson should have received a hamburger cooked to his liking (i.e., having it his way). HBB did not reach a conclusion that Shift Supervisor's behavior in conjunction with the assault on Sampson was "racially motivated," and HBB did not conclude that Shift Supervisor violated company discrimination policies with regard to that incident. Thus, reasonable minds may differ as to how to weigh the fact that HBB's anti-discrimination policies played no role in its decision to terminate Shift Supervisor, which in turn would affect the determination of whether Shift Supervisor was acting in the scope of her employment.

of itself, determinative of whether Shift Supervisor was acting with a purpose of serving HBB's interests. *Phillips v. JCM Dev. Corp.*, 666 P.2d 876, 882 (Utah 1983) (holding that a broker could be subject to liability for a salesperson's tortious acts despite being "in complete violation of [the broker's] established policies and practices").

¶29 Thus, applying the doctrine of respondeat superior to Utah Code section 13-7-4(3), we agree with Sampson that the existence of disputed material facts precludes summary judgment under the UCRA, and therefore the court's grant of summary judgment under this common law cause of action was improper as well.

CONCLUSION

¶30 The doctrine of respondeat superior applies to the UCRA's private cause of action section. Applying respondeat superior to the facts of this case presents a dispute of material fact as to whether Shift Supervisor acted within the scope of her employment when interacting with Sampson. Therefore, we reverse the district court's grant of summary judgment on Sampson's claims.

———————