**2025 UT App 69**

# THE UTAH COURT OF APPEALS

AMY HERZOG AND SHANE HERZOG,
Appellees and Cross-appellants,

*v.*

VAIL RESORTS, INC.,
Appellant and Cross-appellee.

Opinion
No. 20230549-CA
Filed May 15, 2025

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 200500069

Carolyn S. Stevens, Frederick Yarger, William P.
Sowers Jr., and Adam Strachan,
Attorneys for Appellant and Cross-appellee

William J. Hansen, Karra J. Porter, Kristen C.
Kiburtz, John E. Hansen, and Mitchell T. Brooks,
Attorneys for Appellees and Cross-appellants

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1      One evening in 2019, the employees of a ski resort owned by Vail Resorts, Inc. (Vail) gathered for a work-sponsored bowling party. During that party, some of Vail's employees began bowling in increasingly creative ways. At one point, Amy Herzog, who was an employee of the bowling alley, was struck by a bowling ball that had been thrown from another lane by Joe Ellis, who was a Vail employee. The ball crushed Herzog's hand, leaving her with painful and debilitating injuries.

¶2      Herzog later sued Vail for both negligent supervision and respondeat superior (based on Vail's alleged liability for Ellis's negligence). Herzog prevailed on both claims at trial, and the jury awarded her over $2 million in damages. After trial, the district court granted Vail's motion for judgment as a matter of law on the respondeat superior claim, reasoning that there was insufficient evidentiary support for that verdict. But the district court denied a separate motion that Vail filed asking for a new trial on damages, reasoning that there was a sufficient basis for the jury's award.

¶3      Vail now appeals, challenging several rulings from the district court, while Herzog cross-appeals, challenging the court's decision to grant Vail's motion to vacate the respondeat superior verdict. For reasons explained below, we need address only two of the issues raised on appeal: (1) we first address the issue raised in Herzog's cross-appeal, and we conclude that the district court erred in vacating the jury's verdict on the respondeat superior claim; and (2) we next address Vail's challenge to the denial of its motion for a new trial on damages, and we affirm the district court's conclusion that there was a sufficient basis for the jury's award. We accordingly reverse and remand with instructions to reinstate the original verdict.

BACKGROUND[1]

*The Bowling Party*

¶4      Near the end of the 2018–2019 ski season, the senior manager of mountain activities (Manager) at Park City Mountain Resort, which was owned by Vail, organized an "end-of-season party" for the employees she supervised. To request funds for the party, Manager filled out a form for "company-sponsored

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict." *Meeks v. Peng*, 2024 UT 5, n.1, 545 P.3d 226 (quotation simplified).

events." On that form, Manager designated the party as "an official event." The form had a provision stating that it was "intended to ensure that the appropriate level of management has been informed of a company-sponsored event and that supervisory personnel have been identified and are in attendance to provide oversight for the event."

¶5     The party was held at a bowling alley in Park City. Manager paid for the bowling, food, and drinks with a company credit card from Vail. Manager also encouraged her employees to attend the party. Specifically, Manager sent an invitation by email to her employees, posted a notice on a bulletin board at work, and mentioned the party at several morning meetings.

¶6     Ellis worked at the resort that year as a seasonal employee in the mountain activities department. Ellis later testified that he felt that Manager "wanted [him] to go" to the bowling party.

¶7     At the party, the employees socialized with one another and bowled. The employees bowled a couple of games, and as the evening progressed, some of them began engaging in "unusual . . . bowling maneuvers." These employees seemed to be participating in an informal "competition" to "one-up" each other by "bowl[ing] in an unorthodox manner." For example, one employee bowled a ball between his legs while facing the pins, while another bowled a ball between his legs with his back to the pins. Another employee rolled a ball with his foot, while another employee bowled while covering his eyes. Two other employees bowled two balls in the same lane immediately after one another, causing one of the balls to hit the barricade and get stuck in the gutter.

¶8     Amidst all this, Ellis did a "360-degree spin" move while bowling during one of his turns. On his next turn, Ellis tried the same spin move again. This time, however, Ellis's ball flew into an adjacent lane where Herzog was retrieving a ball that was stuck in the gutter. Ellis's ball pinned Herzog's left hand against

the other ball, injuring it. Herzog walked back to the island where customers check in and then "collapsed" in pain.

*Herzog's Injury*

¶9      Herzog was taken from the bowling alley to a local hospital by ambulance. At the hospital, Herzog "couldn't [get] enough pain medication to stop the pain." Herzog was eventually sent home with "prescription painkillers." Doctors told Herzog that she needed surgery on her hand, but the surgery couldn't be performed for a week because her hand was too swollen.

¶10      According to the orthopedic surgeon (Surgeon) who eventually performed that surgery, Herzog's hand sustained "a very severe crush injury," including "fractures to her index and middle finger[s]" and "metacarpal bones that were extremely fragmented," as well as "soft tissue crush." The surgery was "extremely difficult" and took almost five hours. About 20 screws and pins were put into Herzog's hand. After the surgery, Herzog "had bruising all the way up to [her] elbow." Herzog later needed two additional surgeries to remove the hardware from her hand.

¶11      In the weeks following her injury, Herzog "didn't sleep very well" and would wake "up in the middle of the night in screaming pain." Herzog had to keep her hand above her heart at all times to "keep the swelling down." She experienced "sharp pain" and "aching," which the pain medication failed to "alleviate."

¶12      During this time, Herzog couldn't use her left hand—which was her dominant hand—at all. As a result, she "developed trigger finger" in her right hand "from overuse," which would cause "the tendon in [her] thumb" to get "locked down." While recovering, Herzog couldn't work, drive, cook, paint, or garden, which were all things that she normally did. Herzog and her husband also "weren't able to be romantic for quite a long time," and her injury impacted their social life.

¶13 As of the time of trial over two years later, Herzog still had trouble engaging in activities that require fine motor skills, she couldn't make a normal fist with her left hand, and her handwriting had changed. At trial, Herzog's husband observed that her left hand now appeared "clawlike" with "enlarged" knuckles. Surgeon testified that "[t]here's an underlying deformity and stiffness that . . . just won't improve" and that there's "a high probability" that she'll develop "arthritis at the knuckle joints."

*Complaint and Trial*

¶14 Herzog sued Vail, asserting claims for negligent supervision and respondeat superior. In her negligent supervision claim, Herzog alleged that Vail breached its duty of care by "[f]ailing to use ordinary care to prevent the negligent bowling of its employees," "[f]ailing to properly supervise its employees at the event," "[f]ailing to stop the reckless conduct of its employees and see that they bowled in a safe manner," and "[f]ailing to warn the employees and patrons of the bowling alley of the unsafe bowling practices of its employees." In her respondeat superior claim, Herzog alleged that Ellis had acted negligently and that Vail was liable for Ellis's negligence. In support of her assertion that Vail should be held liable for that negligence, Herzog alleged that Manager "organized" the party, Manager "was present at the party," all attendees "were employed by Vail," the party "was for the benefit of" Vail, "Vail intended for its employees to participate in bowling," and "Vail provided food and activities as an incentive for employees to attend the event." Herzog sought noneconomic damages, special damages, litigation expenses, prejudgment and postjudgment interest, and "further relief as the court deems just and equitable."[2]

---

2. Amy Herzog's husband, Shane Herzog, was also a named plaintiff in the complaint. He alleged loss of consortium based on

(continued…)

¶15 The case proceeded to a jury trial in November 2022. At trial, Herzog, Herzog's husband, Manager, and Surgeon testified to the events described above. Ellis was not available to testify, so Vail's counsel read portions of his deposition into the record.

¶16 Some of the testimony focused on the purpose of the bowling party. In a portion of Ellis's deposition that was read to the jury, Ellis expressed his view that the bowling party "certainly benefited Vail." When asked to explain why, Ellis responded that it "foster[ed]" a "team-building activity, [made] a more solid crew," and "maybe incentivize[d] employees to stay or to recruit other employees."

¶17 The parties each called an expert to opine on the purpose of the party. Herzog called a human resources expert, who testified that in her opinion, Vail "use[d] this bowling party as a team-building effort." Herzog's expert testified that "team-building activities" are "absolutely" necessary and "especially" important for companies that use "seasonal or part-time" employees and "want them to return." She explained that in her own past business experiences, she had "approved parties" for that very purpose "because employees are very expensive and it's hard to recruit, so you do those things in order to retain or get them to come back." She further opined that "in seasonal work, you want people to come back" and that an activity "like that" is

---

a "loss of services, emotional support, conjugal fellowship, assistance, comfort, love, felicity, companionship, affection, intimacy, and solace." In the special verdict form described below, the jury awarded Shane $50,000 to compensate him for his loss of consortium. In its opening brief on appeal, Vail made two passing references to that award and suggested that it should be vacated. But Vail did not adequately brief any such challenge, and certainly not to a degree that would persuade us to reverse it. We therefore decline to do so.

Also, because the issues that we do address in this appeal are focused on Amy Herzog's claims, we have used, and will continue using, the singular "Herzog" to refer to Amy Herzog.

"something that you do in order to . . . hopefully retain some employees in the new season."

¶18 By contrast, Vail's ski industry expert testified that in his opinion, "the bowling party was not work-related" and Ellis's "bowling maneuver was not consistent with [his] job duties."

¶19 Some of the testimony focused on what purpose motivated Ellis when he performed the bowling move that led to Herzog's injury. In a portion of his deposition testimony that was read to the jury, Ellis was asked, "Doing a 360 didn't accomplish any of your job duties, did it?" to which Ellis responded, "No." Ellis was then asked what motivated him to do the 360-spin move. Ellis responded, "I'm not sure of any particular motivation. Maybe just, you know—I don't know."

*Jury Instructions, Special Verdict Form, and Verdict*

¶20 In one of the final jury instructions, the court informed the jury that it needed to answer three questions related to negligence:

- "<u>First, you must decide whether Vail is at fault for negligent supervision.</u>" (Underlining in original.) Under this heading, the instruction told jurors that Herzog was alleging that Vail was negligent for "[f]ailing to properly monitor and supervise Joe Ellis at the bowling event," and it laid out the elements of a negligent supervision claim.

- "<u>Second, you must also decide whether Joe Ellis was negligent.</u>" (Underlining in original.) Under this heading, the instruction told jurors that Herzog was alleging that Ellis was negligent for "[f]ailing to use reasonable care when bowling at the bowling event," and it laid out the elements of a negligence claim.

- "Third, you may also need to decide whether Amy Herzog is at fault." (Underlining in original.) Under this heading, the instruction told jurors that Vail was claiming "that Amy Herzog was negligent in causing her own harm," namely, by "[e]ntering a bowling lane without making sure it was safe to do so."

¶21 In another instruction, the jury was told that with respect to Ellis's alleged negligence, Herzog was claiming that Ellis "was acting in the scope of his employment with Vail when he did the 360-spin maneuver at the bowling event." The instruction continued:

> To succeed on this claim, Amy Herzog must prove that Mr. Ellis's 360-spin maneuver: (1) was of the general kind of conduct Joe Ellis was employed to do, or was subject to Vail's control; and (2) was motivated, at least in part, by the purpose of serving Vail's interest.[3]

¶22 In another instruction, jurors were told that Vail was alleging "that more than one person's fault was the cause of the harm." Jurors were told that if they decided that "more than one person [was] at fault," they must then "decide each person's percentage of fault that caused the harm" and the "allocation must total 100%." Jurors were further told that even if they "determine[d] Joe Ellis was acting in the scope of his employment," they "must separately allocate fault, if any, between Vail and Mr. Ellis based on their separate conduct." Finally, jurors were told that they could "decide to allocate a

---

3. In a preliminary instruction given at the outset of trial, jurors were likewise told that Herzog was alleging that Vail was "at fault," in part, "because Joe Ellis was an employee of Vail, and was acting in the scope of his employment" when "he hurled the bowling ball that struck Ms. Herzog."

percentage" to Herzog, that her "total recovery [would] be reduced by the percentage" the jury "attribute[d] to her," and that if they decided "that Amy Herzog's percentage [was] 50% or greater," she would "recover nothing."[4]

¶23 When jurors were sent back to deliberate, they were given a special verdict form. The special verdict form contained a series of 12 questions, and at the outset, it told jurors to answer those questions "in the order they [were] presented."

¶24 While deliberating, the jury submitted a handwritten question that read as follows:

> Assume Ellis is a Vail Employee
>
> - If Ellis [is] 60%
>
> - And Vail is 40%
>
> Is Vail off the hook?

The district court sent back a written response that said:

> No. Vail is responsible for any fault allocated to Vail.
>
> Vail may also be responsible for fault allocated to Mr. Ellis if the jury determines Mr. Ellis was acting in the scope of his employment when he performed the 360-spin maneuver. But do not add Mr. Ellis's

---

4. This instruction was an apparent reference to Utah's comparative negligence scheme. Under the controlling statute, "[a] person seeking recovery may recover from any defendant or group of defendants whose fault, combined with the fault of persons immune from suit and nonparties to whom fault is allocated, exceeds the fault of the person seeking recovery prior to any reallocation of fault made under Subsection 78B-5-819(2)." Utah Code § 78B-5-818.

fault (if any) to Vail's fault (if any). The Court will make the appropriate adjustments after the jury reaches a verdict.

¶25   At the close of deliberations, the jury returned its verdict through a marked and signed copy of the special verdict form. There, in order, jurors found that:

- Vail was at fault and its fault was "a cause of Amy Herzog's harm" (which were questions 1 and 2 on the specifical verdict form);

- Ellis was at fault and his fault was "a cause of Amy Herzog's harm" (questions 3 and 4); and

- Herzog was not at fault (question 5).

Jurors then found that:

- the "percent of the fault that caused Amy Herzog's harm" that was "attributable to Vail" was 80% (question 7); and

- the "percent of the fault that caused Amy Herzog's harm" that was "attributable to Mr. Ellis" was 20% (question 8).

¶26   The special verdict form then told jurors that if they found that Herzog's fault was less than 50%, they should determine whether Ellis was "acting in the scope of his employment with Vail when he did the 360-spin bowling maneuver." Jurors checked "Yes" on the accompanying box. Finally, jurors were asked, "What amount, if any, fairly compensates Amy Herzog" for a series of identified damages. There, jurors awarded Herzog $102,000 in economic damages (broken down on the special verdict form into $88,000 for medical expenses and $14,000 for lost earnings), as well as $2,250,000 in noneconomic damages.

¶27  In December 2022, the district court entered an order and judgment on the jury's verdict, which included awards of prejudgment and postjudgment interest based on applicable 2022 interest rates.

*Posttrial Motions*

¶28  After the judgment was entered, Vail filed two posttrial motions that are relevant to the issues raised on appeal.

¶29  First, Vail filed a motion for a new trial on damages, arguing that the jury's noneconomic damages award "was excessive and objectively fueled by passion and prejudice" and that there was "insufficient evidence to support it." Vail argued that the award was disproportionate with "the nature and extent of [Herzog's] injuries," her "pain and suffering," the extent to which she had been "prevented from pursuing her ordinary affairs," "the degree and character of any disfigurement," the extent to which she "has been limited in the enjoyment of life," and "whether the consequences of the injuries are likely to continue and for how long." Vail further argued that the jury's mid-deliberation question about allocation of fault principles was "direct evidence" that the jury was "focused on punishing Vail."

¶30  The district court denied this motion, ruling that there was "sufficient evidence" to support the noneconomic damages award. The court walked through the factors that it had instructed the jury to consider and compared those to the evidence admitted at trial. On the question of whether the damages award was excessive, the court noted that "Herzog suffered a severe crush injury of her hand that was . . . difficult to repair" and "required upwards of twenty screws and pins"; that she suffered "severe" pain and underwent multiple surgeries; that she has "an ongoing injury," permanent "malrotation of the fingers," an "inability to form a fist," and "scarring"; and that she has "a high probability . . . of developing arthritis." On the question of whether the damages award was a product of passion or prejudice, the court noted that it had "carefully considered and vetted [the] issue" of

juror bias toward or against Vail "during jury selection" and that "the jury seemed to pay attention during the trial," was "engaged, [and] took a reasonable amount of time to deliberate and consider the evidence." Finally, the court declined to "read in any intent to get a certain result from the question" jurors asked during deliberations, instead concluding that "the only reasonable reading is that the jury was seeking to understand whether the fifty-fifty rule would apply between Vail and Mr. Ellis."

¶31　Second, Vail filed a motion for judgment as a matter of law on the respondeat superior claim, arguing that Herzog had "presented no evidence to prove that Mr. Ellis did the 360 maneuver with an intent to serve Vail Resorts' interests." Vail further argued that if this motion was granted, it was also "entitled to a new trial on the remaining negligent supervision claim because there is no way to know how the unsupported respondeat superior claim affected the jury's finding of negligent supervision or the resulting allocation of fault."

¶32　In a decision issued in May 2023, the district court granted Vail's motion for judgment as a matter of law on the respondeat superior claim. The court ruled that there was "ample evidence in the trial record from which the jury could and did reasonably conclude that Mr. Ellis's attendance at the bowling party was motivated, at least in part, [by] the purposes of serving Vail's interest such as the interest in maintaining a team of employees that operated well and smoothly together." But it then concluded that on the narrower question concerning "the 360-spin-bowling maneuver, the evidence [was] much more limited and insufficient to support a reasonable finding by the jury that Mr. Ellis was motivated, at least in part, to serve Vail's interest when he performed that 360-spin-bowling maneuver." The court pointed to Ellis's "unrebutted" testimony "that he had no particular motivation when he performed the maneuver," as well as Ellis's "sworn admission that the maneuver did not comply with or serve any of his job responsibilities."

¶33    But although the court vacated the respondeat superior verdict, it rejected Vail's assertion that this meant it must vacate the negligent supervision verdict too. In the court's view, "the structure of the special verdict form and the contents of the jury instructions" were such that the negligent supervision claim could survive on its own. The court explained that it was "simply not persuaded as a matter of law or under the facts of this case that there is a sufficient level of entanglement between the course and scope of employment question and the other questions that were a necessary part of determining [Herzog's] claims for a new trial to be granted." In light of this decision, the court concluded that Vail would now be liable for the percentage of fault that the jury had allocated to it for Vail's negligent supervision (which, as indicated, was 80%), but that it would not be liable for the other 20% of the damages that the jury had concluded Herzog sustained (which, again, the jury had attributed to Ellis's negligence).

¶34    At the court's request, Herzog's counsel prepared a proposed order that would reflect the court's rulings on the posttrial motions. The proposed order included awards of prejudgment and postjudgment interest based on 2023 interest rates, both of which were several percentage points higher than the rates that were applicable in 2022. Vail subsequently objected, arguing that the 2022 interest rates should apply because the court had originally entered judgment in December 2022. In June 2023, the district court entered an amended judgment that reflected the 20% reduction in damages and that applied 2023 interest rates to that figure.

¶35    Vail appealed, after which Herzog filed a cross-appeal.


ISSUES AND STANDARDS OF REVIEW

¶36    For reasons explained below, we first address Herzog's cross-appeal. There, Herzog argues that the district court erred in granting Vail's motion for judgment as a matter of law on the respondeat superior claim. We review an "order granting [a]

motion for judgment as a matter of law . . . for correctness, and in doing so [we] accept as true all testimony and reasonable inferences that support the jury's verdict." *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 38, 513 P.3d 729 (quotation simplified).

¶37    We next address one issue raised by Vail in its appeal—namely, Vail's argument that the district court erred in denying its motion for a new trial on damages. We review a district court's "decision to grant or deny a new trial" for "abuse of discretion," and "in doing so, we review the legal standards applied by the district court for correctness and the district court's factual findings for clear error." *Id.* ¶ 40 (quotation simplified).

ANALYSIS

¶38    In its direct appeal, Vail argues that the district court erred by: (1) denying its request for a new trial on the negligent supervision claim; (2) denying its motion for a new trial on damages; and (3) applying the 2023 prejudgment and postjudgment interest rates in the amended judgment. In her cross-appeal, Herzog argues that the district court erred in granting Vail's motion for judgment as a matter of law on her respondeat superior claim.

¶39    We address Herzog's cross-appeal first, and the reason for this is that Vail's first and third arguments are both dependent on the continued viability of the district court's decision to vacate the respondeat superior verdict. With respect to negligent supervision, Vail argues that once the district court vacated the respondeat superior verdict, it was required to then vacate the negligent supervision verdict as well because the two claims were intermingled. But Vail did not separately challenge the negligent supervision verdict on its own terms. At oral argument, Vail thus agreed that if we rule in Herzog's favor on her cross-appeal, we would have no need to address its first argument. With respect to the interest rates, the original verdict was issued in 2022, so the

only reason the district court applied the 2023 interest rates was that in 2023, it had granted Vail's motion for judgment as a matter of law on the respondeat superior claim. As a result, at oral argument, both sides agreed that if we rule in Herzog's favor on the cross-appeal, there would be no basis for continuing to apply the 2023 interest rates.

¶40 In light of this, we first address Herzog's challenge to the decision vacating the respondeat superior verdict. As explained below, we agree that the district court erred. As a result, we next turn to the sole remaining issue, which is Vail's challenge to the court's denial of its motion for a new trial on damages.

## I. Respondeat Superior

¶41 The district court granted Vail's motion for judgment as a matter of law on Herzog's respondeat superior claim, concluding that there was insufficient evidence for the jury to have found that Ellis was motivated even in part to serve Vail's interest when he did the 360-spin move that led to Herzog's injuries. Herzog challenges this ruling on appeal. We agree that the district court erred.

¶42 Rule 50 of the Utah Rules of Civil Procedure "permits a court to grant judgment as a matter of law only where 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party' on a claim or defense." *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 46, 513 P.3d 729 (quoting Utah R. Civ. P. 50(a)(1)). When ruling on a motion for judgment as a matter of law, the district court "must look at the evidence and all reasonable inferences in a light most favorable to the nonmoving party." *Id.* (quotation simplified); *see also Meeks v. Peng*, 2024 UT 5, ¶ 28, 545 P.3d 226 ("To prevail, the [moving party] must demonstrate that there was no basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's verdict." (quotation simplified)); *Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 24, 493 P.3d 632 ("A trial court is justified in granting a judgment as a matter of law only if,

examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." (quotation simplified)).

¶43    Respondeat superior is a common law doctrine under which "an employer can be held vicariously liable for the torts of [its] employees" when an employee acts "within the scope of employment" or is "subject to the employer's control." *Sampson v. HB Boys, LC*, 2024 UT App 56, ¶ 24, 548 P.3d 538 (quotation simplified). An "employee's acts are within the scope of employment if (1) the employee's conduct is of the general kind the employee is employed to perform and (2) the employee's acts were motivated, at least in part, by the purpose of serving the employer's interest." *Id.* (quotation simplified). "The question of whether an employee is acting within the scope of employment is a question of fact," and it "must be submitted to a jury whenever reasonable minds may differ as to whether the employee was at a certain time involved wholly or partly in the performance of his employer's business or within the scope of employment." *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1040 (Utah 1991) (quotation simplified).

¶44    Here, the district court ruled that there was "ample evidence in the trial record from which the jury could and did reasonably conclude that Mr. Ellis's attendance at the bowling party was motivated, at least in part, [by] the purposes of serving Vail's interest such as the interest in maintaining a team of employees that operated well and smoothly together." On this point, we agree with the district court.

¶45    As explained above, Manager filled out a form requesting funds for the bowling party as a "company-sponsored event[]," and on that form, Manager designated the party as "an official event." The event was approved by and paid for by Vail. Manager encouraged Vail's employees, including Ellis, to attend the party. Ellis later testified in his deposition that he thought Manager "wanted [him] to go" to the party. He said that he was motivated

to attend the party to build "comradery with [his] coworkers" and because "it was all paid for." And he further explained that "[b]y increasing morale outside of work, it incentivizes you to work harder at work." In addition, Herzog's human resources expert testified that in her opinion, Vail "use[d] this bowling party as a team-building effort," which is especially important for retention of seasonal employees because they "are very expensive and . . . hard to recruit, so you do those things in order to retain or get them to come back." Indeed, at oral argument, Vail conceded that there was evidence from which the jury could find that Ellis's attendance at the party was motivated, at least in part, by serving Vail's interest.

¶46 Since the jury could reasonably think that Ellis's attendance at the party was motivated, at least in part, by a desire to benefit Vail's interest, then we believe the jury could also think that Ellis's participation in the bowling aspect of the bowling party was motivated by that same desire. After all, this was a Vail-sponsored team-building activity at a bowling alley, and, among other things, Vail had specifically paid for the employees' bowling. At oral argument, Vail thus conceded that it was "possible" that the jury could find that Ellis's participation in bowling generally was at least partially motivated by a desire to benefit Vail's interest.

¶47 The remaining question, then, is whether Ellis also needed to have the intent to benefit Vail when he performed the specific 360-spin move that directly led to Herzog's injuries. Vail argues that Ellis was legally required to have this intent with respect to that move, and it then argues that, as a factual matter, Ellis did not. As noted, the district court agreed with Vail on both points. By contrast, Herzog argues that the intent question should not be narrowed to such a level—she thinks it was enough that Ellis intended to benefit Vail while bowling generally—and in any event, Herzog contends that there was evidence from which the jury could conclude that Ellis had the requisite intent even with respect to the particular move.

¶48    We need not decide whether, as a matter of law, the intent analysis could stop at bowling generally, as opposed to the 360-spin move more particularly. This is so because, even if we accept Vail's contention that the intention question could be narrowed to that particular move, we agree with Herzog that the jury could find that even this move was motivated by the requisite intent.

¶49    As noted, whether an employee was acting within the scope of employment is "a question of fact" that "must be submitted to a jury whenever reasonable minds may differ." *Clover*, 808 P.2d at 1040 (quotation simplified); *see also Newman v. White Water Whirlpool*, 2007 UT App 303, ¶ 3, 169 P.3d 774 (noting that "scope of employment questions are inherently fact bound" (quotation simplified)). As also noted, one part of the "scope of employment" analysis is the determination of whether the acts at issue "were motivated, at least in part, by the purpose of serving the employer's interest." *Sampson*, 2024 UT App 56, ¶ 24 (quotation simplified). Our supreme court has thus treated the question of whether an employee was motivated, at least in part, by the purpose of serving the employer's interest as a question of fact. *Christensen v. Swenson*, 874 P.2d 125, 129 (Utah 1994).

¶50    As a result, this question was properly left in the jury's hands if there was any competent evidence to support Herzog's claim. *See Smith*, 2022 UT 29, ¶ 70. And in light of this, Utah appellate courts have repeatedly reversed district court decisions that took scope-of-employment questions away from juries. *See, e.g., Newman*, 2008 UT 79, ¶ 12 (affirming the court of appeals' reversal of summary judgment because "reasonable minds in fact *could* differ as to whether [the employee] was in the scope of his employment" (emphasis in original)); *Christensen*, 874 P.2d at 129 (reversing a district court's grant of summary judgment because "reasonable minds could differ as to whether [the employee] was acting within or outside the scope of her employment"); *Clover*, 808 P.2d at 1043, 1048 (reversing a district court's grant of summary judgment because there was evidence from which a jury could conclude that the employee "was acting within the scope of his employment"); *Sampson*, 2024 UT App 56, ¶ 24

(reversing a district court's grant of summary judgment because "reasonable minds could differ as to whether [the employee] was acting within the scope of her employment"); *Aguila v. Planned Parenthood of Utah*, 2023 UT App 49, ¶ 24, 530 P.3d 959 (reversing a district court's grant of a motion to dismiss because there was no showing that the employee's "conduct was so clearly within or outside the scope of her employment that reasonable minds could not differ").

¶51 While there are cases in which our appellate courts have affirmed decisions to take such questions away from juries, those cases have involved situations where there was simply no competent evidence from which the jury could conclude that the employee was even partially motivated by a desire to benefit the company. In one recent case, for example, our supreme court concluded that a doctor could not be held liable for sexual assaults committed by a physician's assistant who worked at his clinic, concluding that "no reasonable juror could find" that sexual assault was "the general sort of acts" the physician's assistant "was hired to perform." *Burton v. Chen*, 2023 UT 14, ¶ 32, 532 P.3d 1005. In another somewhat similar case, our supreme court held that a municipality could not be held liable when one of its police officers molested a minor, concluding that no evidence existed "that would lead reasonable minds to conclude" that the officer "was acting in the interest" of the municipality "when he committed acts of molestation," and where the officer had "admitted that he committed the acts for his own personal gratification and that he knew the acts were . . . outside the bounds of his employment." *J.H. ex rel. D.H. v. West Valley City*, 840 P.2d 115, 123 (Utah 1992).

¶52 But this case is qualitatively different. Again, respondeat superior doesn't require that the employee be solely motivated by the intent to benefit the company; rather, it's enough if the employee was motivated "in part" by this intent. *Sampson*, 2024 UT App 56, ¶ 24 (quotation simplified). And here, there was evidence showing that Ellis was not acting "from purely personal motives in no way connected with [Vail's] interests." *Birkner v.*

*Salt Lake County*, 771 P.2d 1053, 1057 (Utah 1989) (quotation simplified). Ellis was at a work-sponsored bowling activity, and the district court found (and Vail has conceded) that the jury could rationally conclude that Ellis was motivated to bowl, at least in part, by a desire to benefit Vail. But drawing on that same evidence, the jury could also conclude that the 360-spin move was done to serve that same interest. Since the jury could conclude that bowling with a group of fellow employees was partially done to benefit Vail through an act of team-building camaraderie, then it could also conclude that bowling in an unorthodox manner with those same employees at the same bowling activity was done to serve that same team-building interest.

¶53    Put differently, the court thought there was a meaningful factual and legal line between *bowling* and *bowling in this manner*. But in our view, the same facts that would support a conclusion that Ellis had the requisite intent for the former would also support the conclusion that he had the requisite intent for the latter. And this is precisely what the jury found. The jury was instructed that to find that "Ellis was acting in the scope of his employment with Vail when he did the 360-spin maneuver at the bowling event," Herzog had to "prove that Mr. Ellis's 360-spin maneuver . . . was motivated, at least in part, by the purpose of serving Vail's interest." Having been instructed in this regard, the jury expressly found that Ellis was acting in the scope of his employment at that particular moment.

¶54    On appeal, Vail nevertheless defends the district court's conclusion by pointing to a particular statement from Ellis's deposition (which, again, was read to the jury at trial) where Ellis said that he had no "particular motivation" when he did the 360-spin move. We take the point that, if viewed in isolation, this statement might undercut Herzog's position. But even so, we don't believe that it undercuts her position to such a degree that the district court was entitled to take this factual question away from the jury.

¶55    When evaluating factual questions, juries are allowed to consider the testimony and evidence as a whole. *See State v. Cardona-Gueton*, 2012 UT App 336, ¶ 11, 291 P.3d 847. Juries are also allowed to use common sense and make reasonable inferences. *See State v. Ashcraft*, 2015 UT 5, ¶ 37, 349 P.3d 664. And juries are empowered to disregard testimony if there's reason to do so. *See State v. Torres*, 2018 UT App 113, ¶ 20, 427 P.3d 550. The jury thus "serves as the exclusive judge of both the credibility of witnesses and the weight to be given [to] particular evidence." *Salt Lake City v. Christensen*, 2013 UT App 283, ¶ 2, 317 P.3d 478 (per curiam) (quotation simplified).

¶56    When read in its full context, the statement in question here was hardly definitive. Ellis was asked what motivated him to do the 360-spin move, to which he responded, "I'm not sure of any particular motivation. Maybe just, you know—I don't know." The questioner did not ask a follow-up question at that point, so Ellis did not elaborate further or expound on this answer.

¶57    But there were several qualifiers within the answer—"I'm not sure . . . Maybe just . . . I don't know"—which collectively suggest that Ellis may have either been confused by the question or just didn't have strong feelings about it. And more to the point, Ellis didn't say that he had *no* motivation. Rather, what he said was that he was "not *sure* of any *particular* motivation." (Emphases added.) In other words, Ellis didn't say (and never said) that the 360-spin move was somehow a reflexive or involuntary action (i.e., that he had tripped, spun around, and accidentally dropped the ball). If it was not a reflexive move, however, then Ellis had to have been motivated by something when he did it. And in the context of the evidence as a whole, the something seems clear enough—when Ellis performed this move, he seems to have been motivated by the same thing that motivated him to attend and bowl in the first place. Ellis's use of the word "particular" within this very answer is consistent with this interpretation, suggesting that Ellis was saying he wasn't sure that there was a *particular* (which, in context, can be read as meaning *unique* or perhaps *different*) motivation for making this

move as opposed to any other move that he made that night. At bare minimum, the evidence as a whole could support this conclusion, and this single statement from Ellis's deposition (which was decidedly qualified) doesn't persuade us that the jury could not conclude otherwise.

¶58 In short, we don't believe that the 360-spin move was so different in kind or purpose from the other acts that Ellis performed that night that a jury could not conclude that it was motivated by the same intent. And since, by Vail's own acknowledgment, a jury could rationally conclude that Ellis was at least partially motivated by the intent to benefit Vail when he bowled that night, we conclude that the district court erred when it vacated the jury's verdict holding Vail responsible for Ellis's negligence under a respondeat superior theory. We accordingly reverse that decision, and we remand with instructions for the court to reinstate the jury's verdict on that claim.

¶59 As explained above, this reversal has two additional ramifications relevant to this appeal. First, because we have ruled in Herzog's favor on the respondeat superior issue, we have no need to address Vail's challenge to the court's denial of its request for a new trial on the negligent supervision claim. Second, because the district court's decision to apply the 2023 interest rates was a direct result of its decision to vacate the jury's original verdict, and because we're now directing the court to reinstate that verdict, we further direct the court on remand to reinstate its original judgment that both (1) awarded Herzog all (rather than just 80%) of the damages found by the jury and (2) calculated interest by using the 2022 interest rates. *See Smith v. Volkswagen SouthTowne, Inc.*, 2024 UT App 33, ¶¶ 4–6, 18, 547 P.3d 198, *cert. denied*, 558 P.3d 90 (Utah 2024).

## II. Damages

¶60 Herzog sought both economic and noneconomic damages. "General damages, which are sometimes referred to as 'pain and suffering' or 'noneconomic' damages, measure the amount

needed to compensate an individual for a diminished capacity for the enjoyment of life." *Pinney v. Carrera,* 2020 UT 43, ¶ 36, 469 P.3d 970 (quotation simplified). "In other words, general damages attempt to measure the difference between what life would have been like without the harm done and what it is like as a result of the harm." *Id.* (quotation simplified).

¶61 The jury was instructed that it could consider the following factors in assessing and awarding noneconomic damages:

- "the nature and extent of injuries";

- "the pain and suffering, both mental and physical";

- "the extent to which Amy Herzog has been prevented from pursuing [her] ordinary affairs";

- "the degree and character of any disfigurement";

- "the extent to which Amy Herzog has been limited in the enjoyment of life"; and

- "whether the consequences of these injuries are likely to continue and for how long."

Vail has not argued that these factors were impermissible as a guide for the jury's decision.[5]

¶62 In the original verdict, the jury awarded Herzog $2,250,000 in noneconomic damages. After trial, Vail filed a motion for a new trial on damages, arguing that the damages were excessive. The

---

5. Most of these factors were expressly approved by our supreme court in *Pinney v. Carrera*, 2020 UT 43, ¶ 37, 469 P.3d 970, and the entire list aligns with the Model Utah Jury Instruction on noneconomic damages, *see* Model Utah Jury Instructions 2d CV 2004, https://legacy.utcourts.gov/muji/?cat=1 [https://perma.cc/X N5G-HVCE].

district court denied that motion, and Vail now challenges that ruling on appeal.

¶63    As an initial matter, in a few places in its brief, Vail suggests that there was insufficient "evidence to justify the verdict" under rule 59(a)(6) of the Utah Rules of Civil Procedure. But in Utah, "a party challenging . . . [the] sufficiency of the evidence to support a verdict will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal" the evidence supporting the decision in question. *State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645, *superseded by statute on other grounds as recognized in State v. Richins*, 2025 UT 10, -- P.3d --. And several past cases have applied the marshaling rule to a party's challenge to a damages award. *See, e.g.*, *Traco Steel Erectors, Inc. v. Comtrol, Inc.*, 2009 UT 81, ¶ 18, 222 P.3d 1164; *Wilson v. Sanders*, 2019 UT App 126, ¶ 24, 447 P.3d 1240; *Boyer v. Boyer*, 2008 UT App 138, ¶ 21, 183 P.3d 1068; *Dejavue, Inc. v. U.S. Energy Corp.*, 1999 UT App 355, ¶ 12, 993 P.2d 222.

¶64    But Vail's briefing on the question of damages was decidedly incomplete when it came to describing the evidence about Herzog's injuries. Vail focused almost exclusively on the state of Herzog's hand several months after the incident and her surgeries. In its opening brief, Vail told us that Herzog "testified that her hand caused her no pain" and that the injury had "minimal to nonexistent" lasting effects, and Vail gave almost no indication that there was any evidence to the contrary. As discussed above in the Background and again below, however, there was a great deal of evidence presented at trial showing that while Herzog's pain may have no longer been a daily occurrence by the time of trial, Herzog suffered enormous pain in the weeks and months following the incident and will continue to have lasting effects from her injuries moving forward. By ignoring this evidence, Vail presented this court with a skewed evidentiary picture, and by doing so, Vail did not carry its burden of persuading us that, in light of the full evidentiary picture, the factual evidence was lacking. To the extent that Vail's challenge

to the damages award is factual in nature, we reject it for this reason.

¶65    The main thrust of Vail's argument is directed at the alleged excessiveness of the award itself. Under rule 59(a)(5) of the Utah Rules of Civil Procedure, "a new trial may be granted" based on "excessive or inadequate damages that appear to have been given under the influence of passion or prejudice." In assessing motions made under this rule, our supreme court has "emphasized that juries are generally allowed wide discretion in the assessment of damages." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 71, 372 P.3d 629 (quotation simplified). And our supreme court has further held that because the trial judge was "present for all phases of the trial, the trial judge is in the best position to ascertain if the jury has exceeded its proper bounds," and an appellate court "will reverse only if there is no reasonable basis for the decision." *Id.* ¶ 84 (quotation simplified); *see also ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 2013 UT 24, ¶ 21, 309 P.3d 201 ("A motion for a new trial invokes the sound discretion of the trial court, and appellate review of its ruling is quite limited." (quotation simplified)); *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 804 (Utah 1991) ("The reason that any determination as to whether the jury exceeded its proper bounds is best made in the first instance by the trial court is that the trial judge is present during all aspects of the trial and listens to and views all witnesses. Therefore, he or she can best determine if the jury has acted with 'passion or prejudice' and whether the award was too small or too large in light of the evidence.").

¶66    As a result, to prevail on appeal, Vail must essentially surmount a double-layer of deference—i.e., it must overcome the deference the district court gave to the jury, as well as the deference that we give to the district court's assessment of whether the jury's award was excessive. And "in case of doubt, the deliberate action of the trial court should prevail." *USA Power*, 2016 UT 20, ¶ 84 (quotation simplified).

¶67 Here, Vail broadly argues that the noneconomic damages award was "grossly excessive" and must therefore be vacated. In rejecting that same argument below, the district court pointed to the extensive evidence presented at trial of Herzog's pain and injuries (which, again, Vail did not marshal in its opening brief). This included evidence showing that Herzog "suffered a severe crush injury of her hand that was . . . difficult to repair" and "required upwards of twenty screws and pins"; that she suffered "severe" pain and underwent multiple surgeries; and that she now has "an ongoing injury" that involves permanent "malrotation of the fingers," an "inability to form a fist," "scarring," and "a high probability . . . of developing arthritis." In light of all this, the district court declined to overturn the jury's damages award.[6]

¶68 Vail nevertheless offers several reasons why, in its view, the award should have been overturned under rule 59(a)(5). But we find none of them persuasive.

¶69 First, Vail argues that the noneconomic damages award was necessarily "the product of passion or prejudice" as contemplated by rule 59(a)(5) because it was "so excessive that it shocks the conscience." In support of this argument, Vail relies on *Duffy v. Union Pacific Railroad Co.*, 218 P.2d 1080 (Utah 1950). In

---

6. As noted above in the Background, there was ample evidence to support these conclusions. Among others, Herzog testified that she was in pain after the incident, that she would wake "up in the middle of the night in screaming pain" in the weeks after her first surgery, that her pain was so intense both before the surgery and in the weeks that followed that pain medication could not ameliorate it, and that her life activities were significantly impaired for a substantial period of time while she was recovering from the surgery. The jury observed her hand firsthand and heard various descriptions of it, including from her husband, who described her hand as now being "clawlike" with "enlarged" knuckles, as well as from Surgeon, who testified that "[t]here's an underlying deformity and stiffness that . . . just won't improve."

that case, our supreme court explained that a "verdict might be so grossly excessive and disproportionate to the injury that we could say from that fact alone that as a matter of law the verdict must have been arrived at by passion or prejudice," but to do so "the verdict must be so excessive as to be shocking to one's conscience." *Id.* at 1083. But as just discussed, a noneconomic damages award can turn on a range of factors for which there is no fixed measure—how to value a person's pain and suffering, or the loss of enjoyment of daily activities, or the other things listed above. Cases such as this call upon juries to make value judgments. And while courts certainly play some role in policing the outer bounds of what's permissible, juries are "generally allowed wide discretion in the assessment of damages," *USA Power*, 2016 UT 20, ¶ 71 (quotation simplified), and it's generally left to the district court to determine "whether the award was too small or too large in light of the evidence," *Crookston*, 817 P.2d at 804. Here, unlike members of this court, jurors and the district court heard the evidence firsthand, including Herzog's testimony about her significant pain and suffering, as well as the testimony and evidence of the impairments she has suffered and will suffer moving forward. In light of the jury's advantaged position, we don't believe that this award was so large that we must, or even can, substitute our judgment for that of the jury and then the district court. We therefore reject this argument.

¶70    Second, Vail points out that the noneconomic damages award exceeded the amount requested by Herzog at trial. But our supreme court has cautioned that "the amount requested by the plaintiff does not provide a reliable standard upon which to measure the reasonableness of a jury award." *Pinney*, 2020 UT 43, ¶ 40 n.40; *see also Morga v. FedEx Ground Package System, Inc.*, 2022-NMSC-013, ¶ 46, 512 P.3d 774 ("[T]he fact that the jury chose to award more [noneconomic damages] than what [the plaintiffs] may have suggested is insufficient to infer passion or prejudice."); 2 Robert E. Larsen, *Navigating the Federal Trial* § 13:25 (2024 ed.) (recognizing that a "jury is under no obligation to follow the requests for damages from plaintiff's lawyer" and that a "jury may award more or less, so long as the verdict is supported by the

evidence"). Vail points to no decision holding that a jury cannot award more than a plaintiff has requested, much less a decision holding that a district court must invalidate an award if it did.

¶71    We do recognize the possibility that, in an extreme case, a court could overturn an award if it is truly excessive, and in such a case, the nature of the plaintiff's request may inform that analysis. *See, e.g.*, 2 Robert E. Larsen, *Navigating the Federal Trial* § 13:25 (2024 ed.). But in such a case, the analysis would still turn on the perceived excessiveness of the award itself. And as indicated, we conclude that the award here was not so large that it can be overturned on that basis. As a result, we likewise decline to reverse based on the fact that the jury's assessment of the proper amount of damages was higher than that requested by Herzog's counsel at trial. We therefore reject this argument as well.

¶72    Third, Vail argues that the award was excessive when compared to a few noneconomic damages awards that Vail has identified from other cases. It was unclear to us from Vail's briefing where it drew these cases from, and at oral argument, Vail informed us that it drew these verdicts from a "judgments search" it conducted in an online database. But Vail has provided us with nothing from which we could conclude that this particular database is comprehensive—nor, for that matter, has Vail notified us of the full range of potentially relevant examples, as opposed to those that support its position—so we have no basis for concluding that the few cases Vail chose to highlight are representative of the range of verdicts that are out there in any meaningful sense. And we note that the Restatement has recently expressed caution about relying on such databases, explaining that "[j]ury verdict reporters" are often "incomplete," in part, because they are "generally dependent on lawyers to report their cases," and it further cautioned that such databases "typically contain little detail about the plaintiff and the injury, and what they do contain is not always accurate." Restatement (Third) of

Torts: Remedies § 17 cmt. f (Am. L. Inst., Tentative Draft No. 2, 2023).[7]

¶73    In any event, our supreme court in *Duffy* expressed some wariness about the possibility of making an excessive damages decision through comparative analysis, observing that "[p]reviously decided cases are of little value in fixing present day standards or in assisting courts in determining excessive awards." 218 P.2d at 1084. True, *Duffy* is over 70 years old, and we recognize that some jurisdictions now do permit courts to assess the alleged excessiveness of an award, in part, by comparing the award with awards from "similar cases." Restatement (Third) of Torts: Remedies § 17 cmt. f (Am. L. Inst., Tentative Draft No. 2, 2023). But some other jurisdictions forbid such comparisons. *See* 3 Jacob A. Stein, *Stein on Personal Injury Damages* § 20:7 (3d ed. 2025) (collecting cases). And the Restatement has recently chosen not to "endorse comparative review," in part, because of its concern that "so many facts about each case are relevant to the assessment of damages that no two cases—or at best, very few pairs of cases— are truly comparable." Restatement (Third) of Torts: Remedies § 17 cmt. f (Am. L. Inst., Tentative Draft No. 2, 2023).

¶74    We have similar concerns. Different juries are confronted with different facts involving different plaintiffs who suffered different injuries to different body parts and then endured different ongoing problems. We thus agree with *Duffy* that awards from other cases should ordinarily provide "little value" in determining whether an award from a particular case was excessive. And in light of these concerns, we're not persuaded that

---

7. As explained by the American Law Institute on its website, although this provision is currently labeled as a "Tentative Draft," it has been approved by the American Law Institute's membership—it's apparently just awaiting publication of the "official text"— and it "represents the most current statement of the American Law Institute's position on the subject." *Torts: Remedies*, The Am. L. Inst., https://www.ali.org/project/torts-remedies [https://perma.cc/XZ6T-DARH].

the few cases highlighted by Vail in its brief provide a reliable basis for making a meaningful comparison, nor are we persuaded that they give us sufficient reason to invalidate this jury's award.

¶75 Finally, Vail points out that, mid-deliberation, the jury sent a question to the court asking, "If Ellis [is] 60%—and Vail is 40%—is Vail off the hook?" In Vail's view, this question shows that the jury was improperly motivated by a desire to punish Vail and that this verdict was therefore necessarily the product of "passion or prejudice" as contemplated by rule 59(a)(5). But when Vail made this same argument to the district court below, the court considered and rejected it. The court noted that it had "carefully considered and vetted [the] issue" of juror bias "during jury selection," and it further noted that "the jury seemed to pay attention during the trial," was "engaged," and "took a reasonable amount of time to deliberate and consider the evidence." As to the question itself, the court concluded that "the only reasonable reading is that the jury was seeking to understand whether the fifty-fifty rule would apply between Vail and Mr. Ellis." And there was some reason for the jury to grapple with this concept. The jury was being asked to apportion fault between three different persons or entities (Vail, Ellis, and Herzog). And in both the jury instructions and the special verdict form, the jury was told about the 50% rule that underlies Utah's comparative fault regime. While the question does suggest that the jury was seeking to "understand" how those principles work, as the district court put it, we agree with the district court that, on its own, this question does not demonstrate that the jury was so motivated by a desire to improperly "punish" Vail that its damages award can now be reversed.

¶76 In sum, we recognize that this case resulted in what some may see as a very large noneconomic damages award. But this award was based on evidence that the jury saw and heard, and the decision about how to compensate Herzog for her pain and suffering was the jury's to make. We're not persuaded that the jury's ultimate decision was based on any impermissible factor or fell outside the range of its discretion. We therefore see no abuse

of discretion in the district court's decision to deny Herzog's motion for a new trial on the question of damages.

CONCLUSION

¶77     We first hold that the district court erred in granting Vail's motion for judgment as a matter of law on Herzog's respondeat superior claim. We reverse that decision and order the district court to reinstate the original judgment on remand, as well as to apply the 2022 interest rates. We next hold that the district court did not abuse its discretion in denying Vail's motion for a new trial based on excessive damages, so we affirm that decision.

——————